NAT HOLT AND BLANCHE HOLT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 71800, 72675. Filed January 18, 1961.

*Gerard C. Tracy, Esq.,* and *Thomas E. O'Sullivan, Esq.,* for the petitioners.

*Marion Malone, Esq.,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years 1953, 1954, and 1955 in the amounts of $1,567.96, $18,919.91, and $6,936.90, respectively. Petitioners signed a consent for the assessment and collection of $1,511.63 of the tax deficiency for the year 1955.

The primary issue is whether amounts received by petitioners from Paramount Pictures Corporation upon termination of two agreements, under which petitioner Nat Holt agreed to produce certain motion pictures for Paramount in consideration of a fixed producer's fee plus a participating interest in the excess gross receipts from the pictures he produced, were taxable as ordinary income or as capital gain. A second issue is whether the profit petitioner received on the sale of a motion-picture story which he bought from Paramount for $500 at the time the production agreements were terminated was in reality a part of the consideration paid to petitioner for terminating the agreements, and was thus taxable as ordinary income, under respondent's theory, or was taxable as capital gain.

FINDINGS OF FACT.

Some of the facts are stipulated and are found as stipulated.

Petitioners Nat Holt and Blanche Holt are husband and wife residing in Los Angeles, California. They filed their joint income tax returns for the calendar years 1953, 1954, and 1955 with the district director of internal revenue, Los Angeles, California.

Since 1943 Nat Holt has been engaged as a producer of motion pictures. Specializing in western and outdoor-action-type pictures in the moderate budget bracket, he has worked as both a salaried staff producer for a major production company and as an independent producer.

Prior to February 1950, Holt was approached by Paramount Pictures Corporation with respect to producing motion-picture photoplays. On February 6, 1950, Holt, as an individual, and Paramount executed an agreement whereby the latter engaged Holt (designated

therein as "Producer") to produce for Paramount at studios in the vicinity of Hollywood, California, two motion-picture photoplays, each of feature length, and Holt agreed to deliver to Paramount each of said motion-picture photoplays fully synchronized, edited, titled, cut, assembled, and ready for general exhibition immediately upon its completion. The agreement provided, among other matters, that—

The production cost of each picture was not to be less than $500,000, and not more than $700,000.

Paramount was to approve, before commencement of the picture, literary material or subject matter, writers, final shooting script, principal members of the cast, director, estimated budget cost, and those salaries of the producer's executive and office staffs which were to be charged to production costs.

The producer was not to enter into any other contract relating to the motion-picture photoplays to be produced under the agreement, or relating to the production of any other motion-picture photoplays, until the last picture under the agreement was delivered, without first securing Paramount's approval.

Paramount was to provide the producer with the funds necessary for the production of each photoplay in convenient installments as designated by the producer and as such funds were required.

Each of the pictures to be produced was to be delivered by the producer to Paramount free of any and all claims and demands, and all rights, title, and interest in the pictures, prior to, during, and subsequent to production, was to be the sole and exclusive property of Paramount; also, all props, sets, and other equipment and material purchased for the production of the pictures was to become the exclusive property of Paramount.

The producer was to—

render his own services and to provide the services of his executive staff in connection with the production of the motion picture photoplays to be produced hereunder, * * * devote his entire personal time, best talents and abilities thereto adequately to render and give such supervision and services, and it is further agreed that the rendition of such supervision and services by the Producer personally is of the essence of this agreement. * * *

The agreement was personal and neither party was to assign any rights therein without the consent of the other party, except that the producer was to have the right to assign the agreement to a corporation in which he owned the majority of the stock, in which case, however, the producer was personally to continue to render the services provided for.

All publicity and advertising in connection with the pictures was to be under the sole control of Paramount; Paramount would, however, honor commitments made by the producer to artists with re-

spect to the manner of advertising and publicizing the artists so long as the commitment was not unusual or extraordinary and Paramount was given advance notice thereof.

Neither party was to be a representative or agent of the other and no third party or person, natural or artificial, was to have any rights under the agreement; also, the agreement was not to constitute a partnership or joint venture between the parties.

Holt was to receive under the agreement a production fee of $15,000 for each picture produced, payable $5,000 upon the approval of the story material, $5,000 upon the commencement of the photography, and $5,000 upon the completion and delivery of the picture. Further:

In full consideration for the undertakings of the Producer hereunder * * *, the Corporation [Paramount] agrees to pay to the Producer (in addition to the aforementioned production fee * * *) and the Producer agrees to accept, a sum equal to twenty-five percent (25%) of the gross receipts * * *, if any, derived by the Corporation from the leasing, licensing, sale or other distribution * * * of said motion picture photoplay * * *

over and above 1.9 times the production costs for black and white film and 2 times the production costs for color film. The amount by which receipts exceeded this 1.9 or 2 costs was termed "excess gross receipts."

For the purposes of determining the producer's share of excess gross receipts the pictures to be produced under the agreement were to be considered as a group. "Gross receipts" were specifically defined. Paramount was to make a quarterly accounting of the tentative amounts of gross receipts and the percentage the producer was then entitled to receive, at which time it would be payable to him. An annual statement was also to be supplied the producer. Paramount agreed to release each picture within 1 year after its completion and to use its best efforts to secure the largest return possible.

On October 23, 1950, the agreement was amended to provide for the production of a third picture under the same terms and conditions prevailing under the original agreement.

Prior to the execution of this agreement with Paramount, Holt had become acquainted with William B. Jaffe, a New York attorney, who had represented Holt in past legal matters. When the Paramount deal came up Holt and Jaffe discussed the formation of a partnership between them. They believed that a partnership arrangement would make it possible to ultimately receive capital gains treatment on the gross receipts percentage participation that Holt was to receive in his forthcoming agreement with Paramount. In addition, Holt felt that Jaffe, as his and the partnership's New York representative, could be

instrumental in furthering Holt's interest in the pictures he was to produce. For a number of years Jaffe had been representing motion picture exhibitors, producers, and distributors, and had become well acquainted with executives of Paramount in charge of publicity, distribution, and sales who had headquarters in New York. Because of his relationship with the people in Paramount and heads of eastern theater circuits, Jaffe was in a position to promote the distribution and sales of Holt's pictures, which would lead to greater gross receipts. The discussions between Holt and Jaffe led to Holt's transmitting the following letter to Jaffe, dated February 1, 1950:

Dear Bill:

As you know we have just about concluded our negotiations with Paramount covering the two pictures that we are going to make for and with them. * * *

I appreciate, and I know you understand, that your loyalty, advice, and constructive help have meant a lot in putting over this deal. Even though you haven't asked for it, I do want to put in writing what has always been our understanding as to the Paramount deal. You are a partner with me to the extent of one-third of whatever interest I have or will have in the Paramount deal, or from any monies or things which I may obtain hereafter from that transaction. There is this exception; of the $15,000 per picture which I am to receive designated as a production fee and the $1000 per picture which you are to receive designated as a legal fee.

Out of the first profits payable to me under the Paramount deal you are to receive the sum of $1500. Thereafter, the one-third, two-third arrangement shall apply in all other respects.

This understanding as to our participation in gross under the Paramount deal shall apply so long as there shall ever be any payments due from Paramount in connection with the pictures that will be produced by us including residuals and all other rights in such pictures.

*      *      *      *      *      *      *

If we require any money for this venture I shall contribute two-thirds thereof and you shall contribute one-third thereof.

I am hopeful that with your friendship for the men in the east and if we do a good job here, we will stay on with Paramount for a great many years to come. * * *

*      *      *      *      *      *      *

Just for the record, please put your okay on a copy of this letter for me.

Sincerely,

/s/   Nat Holt
NAT HOLT

The partnership was given the name of "Nat Holt Pictures," and by letter of August 15, 1950, Jaffe informed Holt that he was going to give his law partner, Harold H. Stern, a portion of his interest in the partnership. Holt accepted the proposal, and the participations in the profits, other than the legal and production fees, were modified to provide for Holt, 66⅔ per cent; Jaffe, 20 per cent; and Stern, 13⅓ per cent. On June 30, 1951, Holt and Jaffe filed a "Business Certificate

for Partners" dated December 4, 1950, for Nat Holt Pictures with the county clerk of New York County, New York.

Holt produced the three pictures called for under the agreement and Paramount approached him with respect to producing another block of pictures. In anticipation of entering a second agreement with Paramount, Holt, Jaffe, and Stern on February 6, 1951, executed another partnership agreement, which stated that the business of the partnership was to be the production, exploitation, and distribution of motion pictures. This agreement provided that the firm name was to be "Nat Holt and Company"; that Holt was to be general manager and in charge of all production of the partnership; that he was entitled to receive, prior to the distribution of any profits, the sum of $15,000 or $20,000, whichever was agreed to by the company with which the partnership might contract for distribution of its pictures; that Jaffe and Stern would render all legal services and participate in all negotiations for which they were to receive, prior to the distribution of any profits, $1,000 for each picture and an additional $1,500 out of the first profits payable to the partnership; and that the partnership was to remain in force for 5 years. As in the first partnership arrangement, the representative interests of the partners in the profits or losses were: Holt, 66⅔ per cent; Jaffe, 20 per cent; and Stern 13⅓ per cent. A "Business Certificate for Partners" dated February 15, 1951, for Nat Holt and Company was filed with the county clerk of New York County, New York, on February 20, 1951.

On February 12, 1951, Holt and the Nat Holt and Company partnership entered into an agreement with Paramount whereunder Holt was engaged to produce six motion-picture photoplays. The agreement noted that—

Holt, Jaffe, and Stern * * * represent * * * that under date of February 6, 1951 they entered into a valid, binding and subsisting agreement with each other pursuant to which they formed a partnership * * * and pursuant to which the services of the Producer [Holt] may be contracted for only with the consent of both Jaffe and Stern; * * * and that under the terms thereof Producer [Holt] alone is entitled to be paid and to receive the "Producer's fixed compensation" hereinafter referred to * * * and the Partnership is entitled to be paid and to receive the additional sums (if any) hereinafter referred to in Subdivision (b) of Paragraph EIGHTH hereof.

Holt and the partnership agreed that Holt was to give his entire time and attention to the service of Paramount during the entire period required for the production and completion of the photoplays. Jaffe and Stern agreed "to render such legal services in the State of New York as the Corporation may request of them in connection with any matters pertaining to the production of photoplays referred to herein."

Paramount agreed—

to pay to the Producer and the Producer and the Partnership agree that the Producer will accept, as compensation with respect to each of said photoplays,

the sum of Twenty Thousand Dollars ($20,000) (sometimes herein for convenience referred to as the "Producer's fixed compensation"), * * *

payable in three installments of $6,666.66 each. In addition, under subdivision (b) of paragraph Eighth, Paramount was—

to pay to the Partnership * * * and the Partnership agrees to accept, with respect to any such photoplay, a sum equal to twenty-five percent (25%) of the gross receipts * * *

over 1.9 and 2.1 times the production costs of pictures in black and white and in color, respectively. For the purposes of determining the partnership's share of excess gross receipts, the pictures to be produced were to be divided into two groups of three pictures each. In almost all other respects, including the $700,000 budget limitation, the ownership rights of Paramount, and the required approvals, this 1951 contract, sometimes referred to as the "six-picture agreement," was substantially the same as the 1950 contract, or "three-picture agreement," except for the addition of the references to the "partnership" where appropriate. The six-picture agreement was signed by Holt as "producer" and by Holt, Jaffe, and Stern for "Nat Holt and Company."

On June 6, 1952, petitioner and Jaffe signed a "Certificate of Dissolution of Partnership" certifying to the dissolution of Nat Holt Pictures (the first partnership, formed on February 1, 1950).

On July 11, 1952, Paramount paid to Holt the sum of $100,000 as an advance against the 25 per cent excess gross profits of three of the pictures produced. This money was reported as ordinary income, the only income, of the Nat Holt Pictures partnership for the calendar year 1952. After deduction of certain partnership expenses, including legal and other fees payable to Jaffe, the partnership's net income amounted to $89,715.42, 66⅔ per cent of which, or $59,810.28, was reported as Holt's distributive share. On October 7, 1953, Paramount advanced Holt the additional sum of $35,000 against the excess profits of the same three pictures. This sum was reported as the only income on the 1953 partnership return of Nat Holt and Company. Holt's share after the deduction of partnership expenses was $14,000, which petitioners reported as ordinary income on their 1953 income tax return.

By letter of May 22, 1953, from Paramount to "Mr. Nat Holt and Nat Holt and Company, a Co-partnership composed of Nat Holt, William B. Jaffe and Harold H. Stern," the six-picture agreement was amended to provide for the production of two additional photoplays—"Seven Bad Men" and "Louisiana Lottery"—to be produced within 1 year commencing August 1, 1953. The two additional pictures were to be considered a third group under the agreement for the purposes of determining the partnership's share of excess gross receipts.

On March 25, 1953, Paramount had contracted with a writer for the writing of the story and screenplay entitled "Seven Bad Men." The writer was to receive $10,000 and was to complete and deliver the screenplay by June 7, 1953. The "Louisiana Lottery" story was purchased by Paramount from its author for $15,000 on November 9, 1953, and the author was given the contract for the screenplay at a rate of $10,000, payable $1,000 weekly for 9 weeks commencing on November 19, 1953, and $1,000 upon delivery of the final screenplay, due not later than January 6, 1954.

These two pictures were never produced by Holt for Paramount. Holt completed production of the three pictures under the three-picture agreement and the six originally provided for under the six-picture agreement. Toward the completion of production of the latter pictures, it became apparent to Paramount that the market for pictures of the type and budget that were being produced was diminishing. They were becoming less successful at the box office, and in Paramount's view, no longer a safe investment. Furthermore, the cost of producing such pictures was increasing. As a result, Paramount decided to work out an arrangement to terminate the production of any further pictures by Holt. Holt and Jaffe discussed the situation for about a month or 6 weeks, and on December 31, 1953, concluded the following letter agreement with Paramount which Jaffe had negotiated with Paramount executives in New York:

Gentlemen:

It is hereby agreed between you and the undersigned as follows:

1. The undersigned have produced for you the following nine (9) motion picture photoplays:

\* \* \* \* \* \* \*

2. The undersigned is obligated to produce for you two (2) additional motion picture photoplays which have not as yet been produced by the undersigned and which said two (2) motion picture photoplays were to be financed, released and distributed by you.

3. Pursuant to agreement dated February 6, 1950 between Paramount Pictures Corporation and Nat Holt, as amended, and agreement dated February 12, 1951 between Paramount Pictures Corporation and Nat Holt and Nat Holt and Company, as amended, and other instruments, all of which are hereinafter collectively referred to as said Agreements, you are the sole proprietor and owner of all of the aforesaid nine (9) photoplays listed in paragraph 1, the negatives and copyrights thereof, the literary, musical and other material upon which said photoplays are based or from which adapted and the instruments whereby such literary, musical and other material were acquired.

\* \* \* \* \* \* \*

5. You shall pay to the undersigned the following sums:

(a) The sum of \* \* \* ($7,625.00) on or before December 31, 1953, receipt whereof is hereby acknowledged.

(b) The sum of \* \* \* ($114,875.00) on January 11, 1954.

(c) The sum of \* \* \* ($30,500.00) on January 10, 1955.

6. The undersigned are hereby relieved of the obligation to produce for you the additional two (2) photoplays referred to in paragraph 2 hereof and you relieved of the obligation to finance, release and distribute said two (2) photoplays referred to in paragraph 2 hereof.

7. The undersigned, jointly and severally, hereby relieve, release and discharge, forever, you and your * * * successors and assigns, of and from any and all claims, demands, covenants, obligations, liabilities and causes of action which the undersigned or any of them have or might hereafter have against you * * * arising out of or by reason of or in connection with said Agreements or said nine (9) photoplays listed in paragraphs 1 and 2 hereof, including but not limited to any and all obligation or liability (i) to make payments to the undersigned or any of them of sums by way of percentage of gross receipts or any other sums which are due or payable or to become due or payable with regard to said photoplays and any re-makes, sequels or re-issues of said photoplays, and any of them, or the leasing, licensing, selling, exhibiting, releasing, distributing, television or use of any thereof, (ii) to render and furnish any statements or accountings or to permit any examination, inspection or audit of books and records with respect to said photoplays, (iii) to finance, distribute and release the two (2) photoplays referred to in paragraph 2 hereof, (iv) to pay Nat Holt the past due compensation in the sum of Six Thousand Six Hundred Sixty-Six Dollars and Sixty-Six Cents ($6,666.66), (v) to pay any other compensation and other sums due or payable or to become due or payable under said Agreements on, in or in connection with said photoplays listed in paragraphs 1 and 2 hereof, or any of them, and (vi) to do and perform any other deeds, acts or things arising out of or in connection with said nine (9) photoplays, or any of them, and said Agreements.

8. The undersigned, jointly and severally, hereby convey, grant and assign to you and your successors and assigns any and all right, title and interest they or each of them may have under and by virtue of said Agreements and in and in connection with said nine (9) photoplays listed in paragraph 1 hereof, the material upon which they are based or from which adapted and any and all instruments pertaining thereto.

\*        \*        \*        \*        \*        \*        \*

Please indicate your agreement to the foregoing by signing at the place indicated below.

> Very truly yours,
>
> NAT HOLT /s/ Nat Holt
> NAT HOLT AND COMPANY
> /s/ Nat Holt
> NAT HOLT
> /s/ William B. Jaffe
> WILLIAM B. JAFFE
> /s/ Harold H. Stern
> HAROLD H. STERN

AGREED TO:
PARAMOUNT PICTURES CORPORATION
By /s/ Austin C. Keough
    *Vice Pres.*

During the negotiations Paramount first offered Holt and the partnership approximately $130,000. Holt and his group initially asked for $300,000. The final agreement provided for a total payment of $153,000.

Paramount prepared for its use in the negotiations schedules of the earnings and projected earnings of each of the pictures produced by Holt. Earnings of such pictures can be projected with "close accuracy." The schedules, which were not shown to Holt or his representatives, divided the nine completed pictures into three groups of three each. Each picture was then analyzed with respect to gross rentals, earned and "to come"; production and other costs; "Excess Gross Receipts"; and "Producer's Share—25%." Prepared on December 29, 1953, the schedules indicated negative excess gross receipts for each of the last two groups of pictures. The first group of three pictures was the only one for which excess gross receipts and, as a result, a 25 per cent share was indicated. The ultimate "Producer's Share" for the first group of pictures, after deducting the $135,000 advances in 1952 and 1953, was computed to be $140,000.

When Paramount decided to cease producing pictures of the type with which Holt was involved, it had no further need for the two stories and screenplays for which it had contracted. "Seven Bad Men" had been completed and "Louisiana Lottery" was being worked on. By letter of December 23, 1953, Holt, by Jaffe, as "atty-in-fact," and Nat Holt and Company agreed with Paramount on the purchase of the two stories for $500. This agreement for the purchase and sale of the two stories was confirmed by a more formal letter of conveyance dated January 14, 1954, in which Paramount conveyed and assigned all its rights, title, and interest in the two stories to Holt and Nat Holt and Company, and the latter agreed to pay Paramount $500 and to carry out all those obligations of Paramount under the writers' agreements the time for fulfillment of which had not yet occurred.

Holt subsequently entered into a production arrangement with RKO Radio Pictures Corporation, in which he sold RKO the story "Seven Bad Men" and produced it. The story was sold for $15,000 on or about November 16, 1954. As of the date of trial of this case "Louisiana Lottery" had not been sold or produced.

Petitioners reported on their 1953, 1954, and 1955 joint income tax returns two-thirds of each of the three installments received from Paramount under the December 31, 1953, termination agreement as long-term capital gain. Petitioners also reported two-thirds of the proceeds from the sale of "Seven Bad Men" (less cost) as long-term capital gain on their 1954 joint return. In the notice of deficiency, respondent determined that these amounts received and reported by petitioners were compensation and were taxable as ordinary income.

*Ultimate Findings.*

The producer's right to participate in the excess gross receipts of the photoplays produced under the two agreements was com-

pensation for services rendered or to be rendered under the two production agreements.

The sale of the two stories "Seven Bad Men" and "Louisiana Lottery" by Paramount to Holt and Nat Holt and Company for $500 was a separate arm's-length transaction and was not a "bargain sale" forming part of the consideration for termination of the production agreements.

### OPINION.

The principal issue is whether the $153,000 paid by Paramount to Holt and the partnership of which he was a member was consideration for the sale or exchange of a capital asset, and thus is to be taxed as capital gain, or was ordinary income taxable as such.

The sum involved falls within the broad concept of income set out in section 22(a), I.R.C. 1939, and section 61, I.R.C. 1954, and, there being no basis claimed, is all includible in gross income unless 50 per cent thereof is deductible, or the alternative tax treatment is applicable, under section 117 and sections 1201, et seq., of the two Codes, respectively.

The leniency awarded taxation of capital gains has its genesis in the theory that it would be inequitable to tax all the increase in value of a capital asset, which has occurred over a number of years, in the year in which it is converted; *Herman Shumlin*, 16 T.C. 407; see H. Rept. No. 350, 67th Cong., 1st Sess., p. 10 (1921); and the favorable tax treatment was designed to remove the deterrent effect of such a tax burden on the conversion of capital investments. *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260. This exception to the normal rule of taxation has always been narrowly construed so as to protect the revenue against artful devices. See *Corn Products Co.* v. *Commissioner*, 350 U.S. 46.

It is clear from the language of the production agreements between Holt and Paramount, and we have found as a fact, that the right to participate in the excess gross receipts from the motion pictures produced was given to the producer as compensation for services rendered, whether for Holt's services alone or, as suggested by petitioners, partially for Holt's services and partially for the services of Jaffe and Stern; and petitioners recognized that amounts received under that right prior to termination of the agreements were taxable as ordinary income by reporting the advances received in 1952 and 1953 as ordinary income on their tax returns for those years. All the termination agreement did with respect to these participating interests was to commute into a lump sum the estimated income that would be received therefrom under the production agreements. The commutation of this compensation arrangement into a fixed amount would not change the basic nature of the payments; and unless it

can be shown that the payments, or some part thereof, were for the purchase of a capital asset, the entire amount is includible in ordinary income.

Petitioner argues that the excess gross profits interests were property which fall within the definition of capital assets and that the transfer of those interests to Paramount was a sale or exchange as contemplated by the capital gains provisions of the revenue laws. The fact that the participation interests might, in the abstract, be deemed property rights does not in itself require the conclusion urged by petitioners. As pointed out in *Herman Shumlin, supra,* a legal right or claim may be received under circumstances in which its fair market value is ordinary income when it is received, or it may become income not when the right or claim is received, but when it is converted into cash. The latter was the situation here. The amount received for cancellation of these rights was not a return of capital but was a substitute for receipts that would have been included in gross income as compensation for services rendered if received under the original agreements. *Hort* v. *Commissioner,* 313 U.S. 28. As stated in *Helvering* v. *Smith,* 90 F. 2d 590 (C.A. 2, 1937):

The "purchase" of that future income did not turn it into capital, any more than the discount of a note received in consideration of personal services. The commuted payment merely replaced the future income with cash. * * *

There was no conversion of a capital investment. See *Commissioner* v. *P. G. Lake, Inc., supra.* The fixed amount was received in lieu of the right to receive a somewhat indefinite, although reasonably ascertainable, amount in the future for services rendered in the past. As such it was income and not consideration for the sale or exchange of a capital asset.

Petitioners argue in the alternative that the termination agreement effected a sale of all the partnership's assets, consisting entirely of the participating interests, and was therefore a sale of a partnership interest, which has been recognized as the sale of a capital asset, citing G.C.M. 26379, 1950–1 C.B. 58, and Revenue Ruling 56–5, 1956–1 C.B. 630. The answer to this is that the termination agreement makes no reference to a purchase of partnership interests or even of partnership assets and there is no evidence or reason to think that Paramount would pay anything for the partnership or its assets. Paramount paid what it considered it was obligated to pay under the two picture-production agreements; and thereupon the participating interests ceased to exist. Cf. *W. Ferd Dahlen,* 24 T.C. 159.

A long line of cases, including *Hort* v. *Commissioner, supra; Helvering* v. *Smith, supra; Shuster* v. *Helvering,* 121 F. 2d 643 (C.A. 2, 1941), affirming 42 B.T.A. 255; *Herman Shumlin, supra;* and *David L. Gordon,* 29 T.C. 510, affd. 262 F. 2d 413 (C.A. 5, 1958), have held

that the substitution of a lump-sum payment for the right to receive income in the future does not convert what would otherwise have been taxable as ordinary income into capital gain. We think this case is controlled by that line of cases and not by those cases wherein capital gains treatment was allowed to certain entertainers or producers, such as *Fred MacMurray*, 21 T.C. 15, *Jack Benny*, 25 T.C. 197, *Pat O'Brien*, 25 T.C. 376, and *Julius H. (Groucho) Marx*, 29 T.C. 88. In each of the latter cases, the taxpayers transferred rights in or title to a tangible asset such as a story or a radio or television show under agreements which specified that the negotiated amount was being paid for the tangible asset. The principal issue in those cases was whether the full amount agreed to be paid for the asset was in fact the purchase price of the asset or was payment, in part at least, for the services of the individual taxpayer. Those cases are not controlling here. We conclude that petitioners' share of the payments received under the termination agreement was taxable as ordinary income and respondent is sustained on this issue.

Respondent raised some question as to the bona fides and validity of the two partnerships between Holt, Jaffe, and Stern. In view of our conclusion on the principal issue and the fact that respondent has made no effort to tax to Holt more than two-thirds of the amounts paid by Paramount, we need not decide this question.

The only remaining issue is whether the profit realized by Holt on the sale of his interest in the story "Seven Bad Men" was taxable as ordinary income, or capital gain as reported by petitioners. This story and "Louisiana Lottery" were the two remaining stories that were to be produced under the second production agreement prior to its cancellation. Holt and the partnership bought these two stories from Paramount for $500 at about the time the termination agreement was negotiated. Respondent determined that it was a "bargain sale" by Paramount and the difference in the sale price and the fair market value of the stories was in reality a part of the lump-sum payment made for termination of the participation agreement, and therefore was ordinary income. The evidence on this issue consists of a letter from Jaffe, in behalf of the purchasers, to Paramount dated December 23, 1953, in which the purchase of the two stories was arranged, a more formal letter from Paramount to Nat Holt and Company, dated January 14, 1954, confirming the sale, and the testimony of Holt that this was a separate arm's-length transaction whereby Paramount disposed of two stories it had no more use for at the nominal price Holt and Jaffe were willing to pay. On the other hand, there is also evidence that Paramount had already paid the storywriters considerably more than $500 and that at least one of the stories was completed. However, in the formal agreement it is stated that the purchasers

agreed to assume all obligations under the writers' contracts not yet fulfilled, whatever they may have been. Furthermore, respondent took the deposition of Y. Frank Freeman, who represented Paramount in all dealings with Holt, after the conclusion of the trial and did not ask him about this sale. On the record, we think petitioners have overcome the presumptive correctness of respondent's determination on this issue, and the preponderance of the evidence supports petitioners' position. We conclude that the profit realized by petitioners on the sale of "Seven Bad Men" in 1954 was a long-term capital gain.

*Decision will be entered under Rule 50.*