RALPH BELLAMY AND ALICE BELLAMY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 989–63. Filed January 27, 1965.

*Dana Latham*, *Henry C. Diehl*, and *Henry J. Steinman*, for the petitioners.

*Lawrence S. Kartiganer* and *Michael P. McLeod*, for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in income tax for the taxable year 1957 in the amount of $44,864.77.

The parties having reached agreement as to certain issues, the issue remaining for decision is whether the sum of $89,000 paid to the petitioner Ralph Bellamy in 1957 was proceeds from the sale by him of property which was a capital asset, resulting in the receipt of long-term capital gain as contended by him, or is taxable as ordinary income as determined by the respondent.

FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioners are husband and wife, now residents of Los Angeles, Calif. They filed a joint income tax return on the cash method for the taxable year 1957 with the district director of internal revenue,

New York, N.Y. Hereinafter, Ralph Bellamy will be referred to as the petitioner.

Petitioner is a professional actor and has been engaged in his profession for over 40 years. He is the president of Actors Equity Association and is also a member of the Screen Actors Guild. Prior to October 1, 1949, he appeared on the stage, screen, and radio, but had never appeared on television, which at that time was in its infancy.

On October 1, 1949, petitioner entered into a written employment contract (hereinafter sometimes referred to as the Esty agreement) with William Esty Co., Inc. (hereinafter referred to as Esty), as agent for R. J. Reynolds Tobacco Co. to render his artistic services by performing over a specified period the leading male role in a live television series then entitled "Man Against Crime." The contract also contained specific provisions precluding the petitioner from appearing in any other television program during the term of the contract and limiting his right to appear in any radio or television program for a period of 6 months thereafter. The agreement provided in pertinent part as follows:

. 1. We hereby employ you to render your services as herein described in a series of television programs presently entitled "MAN AGAINST CRIME" to be broadcast on behalf of and advertising the products of R. J. Reynolds Tobacco Company, its subsidiaries and affiliates (herein collectively called "Sponsor"). You hereby accept such employment and agree to perform such services in a competent and artistic manner, to the best of your talents and abilities, for and as directed by us.

\* \* \* \* \* \* \*

4. (a) The term of this agreement shall be for a period of thirteen (13) consecutive weeks commencing with the week ending October 7th, 1949 and ending December 30th, 1949. The said term is herein sometimes called the "principal period".

\* \* \* \* \* \* \*

5. In full consideration for the services to be rendered by you hereunder and the rights and options granted to us, and in complete discharge of our obligations hereunder, we hereby agree to pay you, and you hereby agree to accept, the sum of Fifteen Hundred Dollars ($1500.00) per week during the principal period hereof. Such weekly sums shall be paid to William McCaffrey, as your agent, within ten (10) days after the completion of each broadcast.

6. (a) You hereby grant to us the following exclusive and irrevocable options to extend the term of this agreement for the respective periods hereinafter set forth, upon all of the terms and conditions hereof, except as otherwise hereinafter provided with respect to compensation:

(i) Thirteen (13) consecutive weeks commencing with the week ending January 6th, 1950 and ending with the week ending March 31st, 1950 at Fifteen Hundred Dollars ($1500.00) per week;

(ii) Thirteen (13) consecutive weeks commencing with the week ending April 7th, 1950 and ending with the week ending June 30th, 1950 at Fifteen Hundred Dollars ($1500.00) per week;

(iii) Twenty-six (26) consecutive weeks commencing on a date in October, 1950 to be designated by us at Two Thousand Dollars ($2,000.00) per week;

(iv) Thirteen (13) consecutive weeks commencing immediately upon the expiration of the preceding option period described in the foregoing subdivision (iii) at Two Thousand Dollars ($2,000.00) per week;

(v) Thirty-nine (39) consecutive weeks commencing on a date in October, 1951 to be designated by us at Twenty-Five Hundred Dollars ($2500.00) per week.

\*        \*        \*        \*        \*        \*        \*

8. Each program shall be essentially a live program, with the interpolation of such film or still sequences as we may determine. We shall have the right, without any additional compensation to you, to make television recordings (which term shall mean and include film or motion picture transcription or any other record of the physical form, aural and/or visual, of the said program) of the program by any method. Such recordings, insofar as you are concerned, shall become our sole and absolute property for use as permitted hereunder and may be used for file and reference purposes and for additional, delayed or supplemental coverage, but shall be broadcast only once over such stations which did not carry the original broadcast. Said use shall be subject to the codes, rules and regulations of any Union having jurisdiction, and in no event shall such transcriptions be broadcast later than sixty (60) days after the date of the original broadcast. \* \* \*

\*        \*        \*        \*        \*        \*        \*

10. (a) You hereby grant to us, the Sponsor and the broadcasting system, the right to use and permit others to use, during the term hereof, and for a period of sixty (60) days thereafter, your name, photograph, likeness, biography, facsimile signature and voice, in and in connection with the television program and the advertising, exploiting and publicizing the products and services of the Sponsor and the said television program, it being understood, however, that such use shall not be made for the purpose of endorsement or testimonial without your written consent.

(b) You agree that during the term hereof you will not use or authorize the use of your name, photograph, biography, likeness or voice, or render any services in advertising, exploiting or publicizing any person, firm, corporation, product, services or commercial enterprise competitive to the Sponsor or its products.

(c) We shall have the exclusive right to issue publicity concerning the television program and your connection therewith, and you agree not to release or authorize the release of any publicity matter concerning the aforesaid television program and the rendition of your services in connection therewith.

\*        \*        \*        \*        \*        \*        \*

15. Nothing contained in this agreement shall be construed to obligate us to utilize your services or afford you the opportunity of rendering performances on the television programs, and we shall have fulfilled our entire obligation hereunder by paying to you such sums as provided herein.

\*        \*        \*        \*        \*        \*        \*

20. If this agreement shall remain in full force and effect for its principal period and all option periods, then and in such event during the period of sixty (60) days prior to the expiration of the last option period, you and we will negotiate in good faith for the terms and conditions for an extension of this agreement.

\*        \*        \*        \*        \*        \*        \*

23. \* \* \*

(b) This agreement is entire and complete and embodies all understandings and agreements between you and ourselves and no representations or warran-

ties of any kind or nature have been made by either you or ourselves, except as in this agreement expressly set forth.

(c) This agreement cannot be changed or modified except by an instrument in writing signed by you and ourselves.

(d) This contract shall be construed in accordance with the laws of the State of New York.

Under the agreement Esty had the right to make kinescope films of the live productions. However, the quality of these films was inferior and would not permit the use and reuse to which television films are subject today. Accordingly, in January 1952, Esty proposed to petitioner that the program be filmed with a high-quality film so that the shows could be rerun extensively. As a consequence the petitioner and Esty executed, on January 7, 1952, an amendment to the agreement which granted Esty additional options to extend petitioner's employment for periods totaling 130 weeks over the period through June 1955, at compensation of $3,500 per week. This amendment provided in part as follows:

2. We shall have the right to broadcast the program as a live program or by means of motion pictures in lieu of live broadcasts as we may from time to time determine. * * *

\*     \*     \*     \*     \*     \*     \*

3. (a) If we shall elect to broadcast these programs by means of motion pictures, you agree to render all such services as an actor as shall be necessary in acting, performing, rehearsing and taking part in such motion pictures as we may require. * * *

\*     \*     \*     \*     \*     \*     \*

4. (a) All motion pictures which are produced hereunder shall become and remain our sole and absolute property and during the term hereof and for a period of twenty six (26) weeks thereafter may be used by us for any and all broadcasting purposes for a first use (as hereinafter defined) over each and every station as we may designate from time to time without notice to you in the United States of America, its territories and possessions and Canada and at any times, without restriction or limit whatsoever, and in addition may be used by us for file, reference, promotional, sales and exploitation purposes.

(b) We shall have the further right to broadcast the motion pictures over stations which shall have begun operations after the expiration of the term of this agreement and the aforesaid twenty six (26) week period upon condition that we shall pay you the sum of twenty (20%) percent of the published net time card rate charged by each such station, but in no event shall you receive a total of more than One thousand seven hundred and fifty ($1,750) Dollars with respect to broadcasts over all such stations.

5. (a) As used herein:

i The term "first use" shall mean the first broadcast of any motion picture hereunder over any station in a city.

ii The term "second use" shall mean the second broadcast of any motion picture hereunder over any station in a city in which the motion picture shall have been previously broadcast.

iii The term "subsequent uses" shall mean any broadcast of any motion picture hereunder over any station following the "second use".

iv The term "category of use" shall mean the nature of the use, that is to say whether a "first use", "second use" or "subsequent use".

(b) We shall have the right during the term of this agreement and for a period of twenty six (26) weeks thereafter, to broadcast any motion pictures hereunder for a second use and subsequent uses upon condition, however, that for each second use or subsequent use we shall pay you a sum equal to twenty (20%) percent of the published net card time rate charged by such respective station, but in no event shall you receive more than the sum of One thousand seven hundred and fifty ($1,750) Dollars for all such second or subsequent uses in each category of use.

6. After the expiration of the term of this agreement, we shall have the right to sell, lease or otherwise dispose of such motion pictures to any other person, firm or corporation for television broadcasting on a sustaining or sponsored basis in any country of the world and for theatrical and non-theatrical purposes in any country outside of the continental United States of America, subject to the following conditions:

(a) Such motion pictures may not be sponsored by or advertise any deodorant, laxative, articles of feminine hygiene or similar products.

(b) We agree to pay to you or cause you to be paid a sum equal to twenty (20%) percent of the net proceeds received by us from the sale, lease, license or other disposition of such motion pictures. "Net proceeds" shall mean the sum remaining after deducting agent's commissions and distribution charges which we may be required to pay.

7. Any agreements made for television broadcasting of such motion pictures after the expiration of the term of this agreement and twenty six (26) weeks thereafter shall be subject to cancellation upon your giving us not less than twenty six (26) weeks written notice to such effect if the sponsor, or the products advertised thereon, of any such program shall be competitive to any sponsor of or product advertised on any program on which you shall be rendering your services at such time, or if after using your best efforts in good faith you shall be unable to effect an agreement for your television services to be rendered on behalf of any other person, firm or corporation, without effecting such cancellation.

In early 1954 Esty requested that the petitioner agree to extend, from 26 weeks to 104 weeks, the period during which the films might be shown without any right of cancellation on the part of the petitioner. Petitioner believed that he might become too closely identified with the character "Mike Barnett" which he played in the films (that is, become "typed") and that this might prove detrimental to his professional career after the filming of this series was concluded. He was willing to agree to the extension requested only if Esty would agree to relinquish its right to show the film (and hence its right to sell the films for showing) after the expiration of the 104-week period. On February 23, 1954, the petitioner and Esty entered into the following letter agreement:

This will refer to the agreement entered into between us dated October 1, 1949, as amended by agreements dated June 8, 1951, January 8, 1952 and April 15, 1953 (all of which agreements are herein collectively sometimes called "Agreement"), relating to your services in the series of television programs presently entitled "MAN AGAINST CRIME". It is hereby agreed that the said Agreement shall be further amended and supplemented as follows:

1. In addition to the rights granted to us under the aforesaid Agreement, we shall have the right for a period commencing on the date hereof and ending 104 weeks after the expiration of the term of the aforesaid Agreement, to sell, lease,

license, or otherwise dispose of the motion pictures covered by the Agreement, to any person, firm or corporation for television broadcasting on a sponsored basis for a first use, second use and subsequent uses (as such terms are defined in the aforesaid Agreement) on behalf of any other advertisers or sponsors regardless of number, and on any stations, or on a sustaining basis, all as we may determine, in the United States of America, its territories and possessions, and the Dominion of Canada, and in such connection to use and permit the use of your name and photograph to advertise and exploit such motion pictures, subject to the following terms and conditions:

(a) First use on behalf of any advertisers or sponsors other than ourselves may occur only in such cities where we have not theretofore telecast such motion pictures on behalf of ourselves.

(b) The motion pictures may not be sponsored by, or advertise any deodorant, laxative, articles of feminine hygiene, or similar products.

(c) With respect to the first use on behalf of any advertiser or sponsor (other than R. J. Reynolds Tobacco Company), we shall pay you a sum equal to ten (10%) percent of the net proceeds received by us from such sale, lease, license, or other disposition of such motion pictures consummated prior to May 1, 1954, and twenty (20%) percent of the net proceeds received by us from such sale, lease, license, or other disposition of such motion pictures consummated on and after May 1, 1954. With respect to second use or subsequent uses, we shall pay you twenty (20%) percent of the net proceeds received by us from such sale, lease, license or other disposition of such motion pictures. Net proceeds means the sums remaining to us after deducting agent's commissions and distribution charges, costs and expenses, including but not limited to advertising, prints, editorial and other costs which we may be required to pay.

We shall render to you quarterly accountings and pay you simultaneously therewith such amount as may be shown thereon to be due to you.

As herein modified, the aforesaid Agreement shall continue in full force and effect.

The term of the Esty agreement expired in June 1954 (options to extend it not having been exercised), and thereafter no further acting services were performed by petitioner pursuant to the agreement and no further films were produced by Esty. The 104-week period described in the agreement dated February 23, 1954, expired on or prior to June 30, 1956, and thereafter no film made pursuant to the Esty agreement was authorized by Esty to be broadcast in any manner whatsoever over any station either in the United States or abroad.

During the term of the Esty agreement and during the ensuing 104-week period, Esty did not sell, lease, or otherwise dispose of the films made pursuant to the agreement, except that on April 1, 1953, it made a distribution agreement with Music Corp. of America-TV (MCA) for that organization to distribute the films in markets not used by R. J. Reynolds Tobacco Co. Accountings were rendered to petitioner with respect to payments made by MCA to Esty for such distribution rights, and petitioner reported the amounts paid to him as ordinary income for the taxable years 1953 to 1957, inclusive.

In the latter part of 1954 MCA contacted petitioner in an attempt to have him alter his agreement with Esty to extend the time within which the films could be shown under the syndication which MCA had

arranged. The petitioner, through his agent, the William Morris Agency, informed MCA that he was not interested in having the films on the air after the 104-week period. In 1956, after the expiration of the 104-week period, MCA again contacted petitioner in an effort to obtain permission to use the films. However, again the petitioner refused to negotiate with MCA; rather, he considered the possibility of securing Esty's interest in the films and any rights held by others, and syndicating and distributing the films himself. The William Morris Agency investigated this possibility but nothing was accomplished.

Although its negotiations with petitioner had been unsuccessful, MCA decided to purchase whatever rights other parties might have in the films. On June 13, 1957, R. J. Reynolds Tobacco Co., by its agent, Esty, entered into an agreement with a subsidiary of MCA, Revue Products, Inc. (hereinafter referred to as Revue), transferring to Revue all interests which it had in the films. Such agreement provided in part as follows:

3. We warrant and represent that we are the owner of the physical motion pictures or other physical articles transferred to you hereunder.

    *      *      *      *      *      *      *

8. You shall give us, simultaneously with the execution of this agreement, assumption agreements called for by any union or unions having jurisdiction, and you shall pay all fees, charges, taxes or other costs in connection with any use of the photoplays hereafter.

    *      *      *      *      *      *      *

10. In consideration of the grant made by us to you, you shall pay to us the sum of Twelve Thousand Five Hundred ($12,500.00) Dollars on signing of this agreement. In the event that you enter into an agreement or agreements between you and RALPH BELLAMY and/or MESSRS. KLEE and/or COOPER, their estates, successors, or assigns and such other persons, firms or corporations as may be necessary to clear your rights for broadcasting of the photoplays, as hereinabove provided, to the photoplays, you shall pay to us an additional sum of Five Thousand ($5,000) Dollars within thirty (30) days after the execution of all such agreements or the first broadcast, whichever is sooner.

After petitioner's performances in the "Man Against Crime" series terminated in June 1954, he worked in one motion picture and made guest appearances on television shows. In 1957 he appeared in the stage play "Sunrise at Campobello," which ran for over 2 years in New York City. At about that time petitioner considered that it might be helpful to have television exposure while he was engaged in the New York play. The William Morris Agency then entered into negotiations with MCA.

On December 27, 1957, petitioner and Revue executed an agreement which provided in pertinent part as follows:

Actor [petitioner] has rendered services as Actor and/or otherwise in connection with a Series of photoplays and/or television programs entitled "MAN AGAINST CRIME", also known as "FOLLOW THAT MAN". The photoplays

in the series are hereinafter referred to collectively and severally as the "Series". Said Series was produced by William Esty Company as agent for and on behalf of R. J. Reynolds Tobacco Company (herein called "Producer") and said Actor rendered his services as an employee of Producer. On or about May 20, 1957 Producer sold, transferred, assigned and quitclaimed unto Revue Productions, Inc. (herein called "Corporation") in perpetuity, all of its right, title and interest in and to said Series, and the Property (as hereinafter defined) including all rights and properties acquired from said Actor and others.

Now, THEREFORE, the said Actor and the said Corporation do hereby agree as follows:

1. In addition to the rights, interest and property that Corporation acquired from Producer in connection with said Series, Actor hereby grants to said Corporation, subject only to the limitations hereinafter explicitly set forth, the unrestricted right, in perpetuity, throughout the world to sell, lease, exhibit, license, mortgage, hypothecate or otherwise dispose of and exploit said Series, the photoplays and all rights and interests in connection with said Series. * * * The rights herein granted by Actor are in addition to, and not in any way a limitation on, the rights Corporation acquired from Producer, and the Actor agrees that Corporation is assigned any and all rights granted by the Actor to Producer in connection with said Series and the property rights to Series. Without limiting the generality of the foregoing in any way whatsoever, the grant is hereby deemed a grant of all rights the Actor ever had, does now have, or acquires in the future in and to Series, including but not limited to the results and proceeds of the Actor's services rendered to the Producer in connection with Series.

2. Corporation and Actor expressly understand and agree that all dialogue, all photoplays of Series, all films, recordings, prints and copies thereof and all rights therein, and all results and proceeds of Actor's services in and in connection with Series and rendered to Producer shall, as between Actor and Corporation be the sole and absolute property of the Corporation for any and all purposes whatsoever, in perpetuity, * * *

*　　　*　　　*　　　*　　　*　　　*　　　*

4. (a) Actor warrants that Actor has the right to make this Agreement and that except as set forth in Paragraph 4(b) Actor has no present contract or commitment and agrees not to enter into any contract which can or may prevent Corporation from exhibiting or causing to be exhibited the said Series or any of the photoplays in said Series, in any media whatsoever throughout the world, in perpetuity, without restriction, or prevent the Corporation from enjoying any of the rights acquired hereunder, or from the Producer.

(b) Corporation agrees that it will not authorize the telecasting in the United States of the Series, while Actor is regularly appearing as the star performer on any hereafter produced and telecast United States national television network series of programs of which Actor has notified Corporation as hereafter provided (hereinafter referred to as Actor's Program), on behalf of any Sponsor whose products are competitive with the products of the sponsor of not less than one-half hour of Actor's Program. Such restriction shall apply notwithstanding any other provision of this agreement to the contrary * * *

*　　　*　　　*　　　*　　　*　　　*　　　*

(d) Artist agrees that in the event the said Series is licensed for use on a U.S. national television network for not more than one Sponsor during each one-half hour, Artist will not regularly render his services on any U.S. Series of programs, nor permit the use of any such Series of programs in which he regularly appears on behalf of, nor permit his name or likeness to be used by or

for any Sponsor, in connection with such Series, whose products are competitive with the said national network Sponsor of the Series. * * *

\*       \*       \*       \*       \*       \*       \*

6. Actor agrees that rights and warranties granted and made herein are in addition to any rights or warranties granted or made to Producer in connection with Actor's agreement with Producer, which rights and warranties were assigned (and to which assignment Actor hereby consents) to and for the benefit of said Corporation.

\*       \*       \*       \*       \*       \*       \*

9. The Actor grants to the Corporation the exclusive right to use and to permit others to use the Actor's name, photograph, biography and soubriquet and Actor's actual or simulated likeness, signature and voice in connection with advertising or publicizing the Series, or any part thereof, alone or in conjunction with other photoplays, or Actor's services in the Series. * * *

\*       \*       \*       \*       \*       \*       \*

12. Actor agrees that the payments provided for in Paragraph 13 hereof shall, as between Actor and Corporation, be and are in lieu of any and all payments that are or might become due or payable to the Actor pursuant to any agreements between the Actor and Producer or otherwise, by way of series compensation, theatrical exhibition compensation, percentage of gross receipts or net profits compensation or otherwise. Nothing contained in this agreement shall require Actor to violate any applicable collective bargaining agreement. There shall be applied against any additional compensation due Actor pursuant to the provisions of any applicable collective bargaining agreement, whether by reason of re-runs or any other uses of the Series or exercise of Corporation's rights hereunder, all amounts heretofore, now or hereafter received by Actor, in connection with the Series in excess of the minimum compensation required by the applicable collective bargaining agreement, whether such payments were or are made by producer, Corporation or otherwise or by way of lump sums, percentages of receipts or otherwise.

13. (a) In consideration of the foregoing, Corporation agrees to pay to Actor the sum of $89,000.00 simultaneously with execution of this agreement by Corporation and in addition thereto an amount equal to 30% of the net receipts derived from the exploitation, distribution and licensing of the said Series as hereinafter provided.

(b) Net receipts, as used in this agreement, shall mean the balance remaining after the deduction from the gross receipts of all of the following:

\*       \*       \*       \*       \*       \*       \*

(4) the sum of $89,000.00 representing the amount paid by Corporation to Actor pursuant to Paragraph 13(a) of this agreement.

(5) the sum of $17,500.00 representing amounts paid by Corporation to Producer in connection with obtaining ownership of the Series.

As of the end of 1963 petitioner had received no payment from Revue in excess of the $89,000. Upon the receipt of the $89,000 from Revue, the petitioner paid the William Morris Agency 10 percent thereof, or $8,900. He also paid $8,900 to William McCaffrey, who was his agent throughout the term of the Esty contract and who negotiated such contract and the amendments thereto.

Agency agreements ordinarily provide, in accordance with union rules, that no double commission shall be paid agents for services ren-

dered, but neither union rules nor agency agreements bar such double payment when a sale of rights is involved.

It is the trade practice to include in contracts of this nature affirmative provisions respecting the right to use films after termination of the employment. Generally, contracts provide that the producer shall have perpetual rights to do whatever he wishes with the film.

In their joint income tax return for the taxable year 1957, the petitioners reported long-term capital gain of $71,200 from the sale in that year of "Television rights 'Man Against Crime,' " showing date of acquisition as 1954, gross sales price of $89,000, no cost or other basis, and expense of sale as $17,800.

In the notice of deficiency the respondent increased by $89,000 the amount of ordinary income reported by the petitioner and, consistently, excluded from taxable income any capital gain. He explained his determination as follows: "It has been determined that the proceeds from the 'Man Against Crime' television shows are ordinary income. Hence, the capital gain deduction claimed in your return in respect to this income is not allowable, and your taxable income is increased $53,400 accordingly."

OPINION

The petitioner contends that the amount of $89,000 which he received from Revue in 1957 constituted proceeds from the sale of a capital asset under section 1221 of the Internal Revenue Code of 1954,[1] and that the gain derived upon such sale is taxable as long-term capital gain under the provisions of section 1222 of the Code. It is his position that, although he did not own the films themselves, he had the absolute right under the agreement with Esty, as amended by the letter agree-

[1] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

    (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

    (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

    (3) a copyright, a literary, musical, or artistic composition, or similar property, held by—

        (A) a taxpayer whose personal efforts created such property, or

        (B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property;

    (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or

    (5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

ment of February 23, 1954, to prevent the distribution and showing of the films; that this right constituted a proprietary interest in the films, and hence "property"; that since such "property" does not fall within any of the exclusions of section 1221, it must be considered as a capital asset; and that such capital asset was sold to Revue for $89,000, resulting in the receipt of long-term capital gain.

The respondent contends that the February 23, 1954, amendment to the Esty agreement did not deprive Esty of the right to distribute and show the films after the expiration of the 104-week period set forth in such amending agreement and leave the petitioner with the absolute right to thereafter prohibit the showing of the films. He points out that such agreement of February 23, 1954, specifically recites that any rights granted therein to Esty are in addition to any rights granted to Esty under the original agreement and prior amendments thereto, and claims that in the February 23, 1954, agreement there is no specific prohibition against the use of the films by Esty after the expiration of the 104-week period. He contends that in any event, however, any right which the petitioner granted or transferred to Revue did not constitute a capital asset, and that the full amount of $89,000 constituted ordinary income.

The petitioner testified, in substance, that the purpose and effect of the amending agreement of February 23, 1954, was to accomplish a trade whereby Esty obtained an extension of the period, from 26 weeks to 104 weeks, within which it had the unfettered right to sell, lease, license, or otherwise dispose of the films, and gave up the restricted right, which it theretofore had, to thereafter sell, lease, license, or otherwise dispose of the films. We find it unnecessary to decide whether the petitioner's interpretation of the agreement is correct. Even if it be assumed, *arguendo*, that after the execution of the agreement of February 23, 1954, the petitioner had an absolute right to prohibit the distribution or showing of the films after the expiration of the 104-week period, and that he in effect sold such right to Esty when he granted Esty the right (qualified to the extent provided in par. 4(b) of the agreement of Dec. 27, 1957) in perpetuity to distribute and show the films, we think that there was not the sale of a capital asset within the meaning of section 1221 of the Code.

It is well established that not everything which can be called property in the ordinary sense, and which is outside the statutory exclusions, qualifies as a capital asset; and that a capital asset is something in which the taxpayer has an investment, and hence a basis. In *Commissioner* v. *Gillette Motor Transport, Inc.*, 364 U.S. 133, the Supreme Court stated in part:

While a capital asset is defined in § 117(a)(1) as "property held by the taxpayer," it is evident that not everything which can be called property in the

ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. *Burnet* v. *Harmel*, 287 U.S. 103, 106. Thus the Court has held that an unexpired lease, *Hort* v. *Commissioner*, 313 U.S. 28, corn futures, *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, and oil payment rights, *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, are not capital assets even though they are concededly "property" interests in the ordinary sense. And see Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv. L. Rev. 985, 987–989 and Note 7.

In the present case, respondent's right to use its transportation facilities was held to be a valuable property right compensable under the requirements of the Fifth Amendment. However, that right was not a capital asset within the meaning of §§ 117 (a) (1) and 117 (j). * * *

That right is not something in which respondent had any investment, separate and apart from its investment in the physical assets themselves. Respondent suggests no method by which a cost basis could be assigned to the right; yet it is necessary, in determining the amount of gain realized for purposes of § 117, to deduct the basis of the property sold, exchanged, or involuntarily converted from the amount received. § 111(a). Further, the right is manifestly not of the type which gives rise to the hardship of the realization in one year of an advance in value over cost built up in several years, which is what Congress sought to ameliorate by the capital-gains provisions. * * *

To the same effect are *Miller* v. *Commissioner*, (C.A. 2) 299 F. 2d 706, affirming 35 T.C. 631, certiorari denied 370 U.S. 923; *Commissioner* v. *Ferrer*, (C.A. 2) 304 F. 2d 125, affirming in part and reversing in part 35 T.C. 617; *United States* v. *Woolsey*, (C.A. 5) 326 F. 2d 287; and *Holt* v. *Commissioner*, (C.A. 9) 303 F. 2d 687, affirming 35 T.C. 588. See also *Graham* v. *Commissioner*, (C.A. 2) 304 F. 2d 707, affirming 36 T.C. 612. In *Holt* v. *Commissioner*, *supra*, it was stated:

The essence of a capital transaction within the tax statutes and decided cases is that the sale or exchange of an asset results in a return of a capital investment coupled with realized gain or loss (as the case might be) which accrues to the investment over a certain period of time. The petitioner invested nothing for the return of 25% of the excess gross receipts of the films except his services as a producer. There was no return of a capital outlay in this case. * * *

While the right which the petitioner granted to Revue to distribute and show the films might, in the ordinary sense, be characterized as a property right, he had no investment therein, aside from the services which he had performed in connection with the making of the films, and hence such right had no cost basis in his hands. Such right was "not of the type which gives rise to the hardship of the realization in 1 year of an advance in value over cost built up in several years, which is what Congress sought to ameliorate by the capital gains provisions."

We note that in the agreement between the petitioner and Revue it was provided that the grant to Revue included the petitioner's rights to "the results and proceeds of the Actor's services rendered to the Producer in connection with the Series" and that the $89,000 payment and any additional percentage payments were "in lieu of any and all payments that are or might become due or payable to the Actor pursuant to any agreements between the Actor and Producer or otherwise, by way of series compensation, theatrical exhibition compensation, percentage of gross receipts or net profits compensation or otherwise." Whether the $89,000 which the petitioner received from Revue represented, in whole or in part, commutation of the petitioner's right to compensation for past services, or whether it represented, in whole or in part, proceeds from the sale of property which was not a capital asset, the result would be the same, i.e., the $89,000 would be taxable as ordinary income.

We have given careful consideration to the petitioner's contention that the instant case is governed by *Commissioner* v. *Ferrer, supra.* There the taxpayer had obtained from the author of a novel and a play based thereon the exclusive right, as "lessee," to produce the stage play within a specified time upon the payment of specified amounts as advances against royalties, and within an additional time upon the payment of a specified additional advance. All these advances were paid. As an incidental part of his right as "lessee," the taxpayer had the right to prevent the sale by the author, until after the production of the play, of the motion picture and other rights. Instead of producing the play, the taxpayer later surrendered to the author his "lease" of the play, his power incident to the lease to prevent any disposition of the motion picture rights, and his right to share in 40 percent of the proceeds of any motion picture and other rights had he produced the play. Thereupon the author sold to a third party all motion picture and other rights to his novel, and the taxpayer received from such third party the right to specified percentages of net profits from distribution of the motion picture. The court held that the portion of the percentage payments received which was properly allocable to the taxpayer's surrender of the "lease," and the right incident thereto to prevent the sale of the motion picture and other rights, were proceeds from the sale of a capital asset, namely, the "lease." It will be seen that the facts in the *Ferrer* case are substantially different from those obtaining here. There the right which was transferred was incidental to a property interest, namely, the "lease" of the play, in which the taxpayer had an investment, and was not a right stemming from a

contract of employment. Clearly the amount in question in the instant case did not represent, to any extent, consideration for the transfer of any property interest comparable to that involved in the *Ferrer* case. We do not consider that case as applicable here.

The parties have agreed that if, as we have decided, the amount paid petitioner by Revue is taxable as ordinary income, the respondent properly disallowed the deduction of the amount of $17,800 which petitioner paid to William McCaffrey and the William Morris Agency.

*Decision will be entered under Rule 50.*