JACKSON HILL AND IRENE HILL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1179–65. Filed March 23, 1967.

*Martin Sosin,* for the petitioners.
*James J. Cotter,* for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in petitioners' income tax for the calendar year 1962 in the amount of $13,350.24.

The issue for decision is whether an amount received by one of petitioners, representing a portion of the receipts by the company by which he was employed from the sale of a television production was taxable as capital gain or ordinary income.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Jackson Hill and Irene Hill, during the year 1962, were husband and wife residing in Van Nuys, Calif. They filed a joint Federal income tax return for the calendar year 1962 with the district director of internal revenue, Los Angeles, Calif.

Jackson Hill (hereinafter referred to as petitioner) was employed by the Times-Mirror Broadcasting Co. (hereinafter referred to as KTTV) from sometime in 1954 to July 31, 1961, as a writer and/or producer of various television programs or series to which he might be assigned.

Petitioner's employment agreement with KTTV when he commenced working for that company was an oral agreement. He was to write and produce any show to which he was assigned and for his services he was to receive a weekly salary. There was also to be an arrangement whereby petitioner would receive 5 percent of "any property" on which he worked. Petitioner understood that he was to receive the 5 percent as an inducement to work on these properties. Petitioner also understood that he could assign the 5-percent interest he was to receive or sell it.

In 1958 KTTV originated the idea of a television series under the title, "Divorce Court," and assigned petitioner to write and produce the series. On August 1, 1958, a memorandum agreement concerning the "Divorce Court" series was reached between petitioner and KTTV. This memorandum agreement covered a period of 5 years cancelable by KTTV on or before 30 days prior to the end of each year. It provided that petitioner's duties were to perform as "producer and/or writer on any programs to which KTTV" might assign him. The memorandum agreement set forth a schedule of petitioner's compensation on a weekly basis for each of the 5 years, and following this schedule was the statement that "Additionally, Hill is to receive 5% of the net profits accruing to KTTV as a result of any multimarket sale of any program

to which he is permanently assigned. We'll have to work out this clause rather carefully when you return from vacation." The memorandum agreement further stated that petitioner's services were exclusive to KTTV. This memorandum agreement was initialed by Robert Breckner, who at the time was program director of KTTV. Breckner was the officer of KTTV who had represented that company in negotiations with petitioner at the time of petitioner's original employment by KTTV. The memorandum agreement was signed as approved by petitioner.

The memorandum between petitioner and KKTV was referred to H. Bruce Baumeister who at the time as resident counsel for KTTV passed upon all legal matters for that company and either drew or approved all contracts entered into by the company. Baumeister, after receiving a copy of the memorandum agreement between petitioner and KTTV from Robert Breckner, prepared a document which was to be a formal contract between KTTV and petitioner which he submitted to petitioner for signature. The contract drafted by Baumeister provided for a profit participation by petitioner with respect to any show or series which he wrote or directed but that petitioner was to have no title to any of the products. The agreement also provided for a certain percentage for writing a series or show and a certain percentage for directing such series or show. The contract drawn by Baumeister was not executed by petitioner and no formal agreement was ever entered into between petitioner and KTTV. Petitioner was of the opinion that the proposed agreement did not make clear the arrangements which he had with KTTV.

Petitioner's assignment to write the "Divorce Court" series was the same type of assignment as he had received with respect to a number of other series. The original assignment contemplated a series running for 13 weeks. Of the other series to which petitioner was assigned only one ran over 13 weeks and it was nevertheless a failure.

"Divorce Court" demonstrated potential as a successful series and ran well over 13 weeks. "Divorce Court" was a different type of writing from other series petitioner had written and produced. Generally, for an hour series, the script petitioner wrote would run from 50 to 60 pages, but his "Divorce Court" script would run approximately 14 pages and this method of writing contemplated the use of the actors' own characters to blend their own personalities into the show, which in petitioner's opinion made the show look real. The method of writing of the "Divorce Court" series was the most important element of the show. In producing "Divorce Court" petitioner interviewed and chose the actors, directed their rehearsals, organized the crews responsible for the sets and lighting, and even to a large extent directed the publicity.

Several times during the years 1958 through 1960, petitioner received 5 percent of the net proceeds generated from the exhibition of "Divorce Court" on KTTV and 5 percent of amounts received from the leasing of the series "Divorce Court" to other television stations. He reported these amounts on his income tax returns for the years in which they were received as ordinary income. Petitioner had no money investment in the "Divorce Court" series.

On June 29, 1961, a sales agreement was executed between KTTV and Storer Broadcasting Co. whereby KTTV assigned all right, title, and interest in the "Divorce Court" series to Storer Broadcasting Co. This agreement contained among others the following provisions:

(1) As of the effective date, Storer Broadcasting Company hereby purchases from Times-Mirror Broadcasting Company and Times-Mirror Broadcasting Company hereby sells to Storer Broadcasting Company, all of its right, title and interest in and to the one-hour television series entitled DIVORCE COURT, including but not limited to the format, title, master tapes and syndication copies, and all proprietary interest of Times-Mirror Broadcasting Company therein.

(2) The purchase price to be paid by Storer Broadcasting Company shall be $1,105,000, payable $500,000 upon the effective date of this agreement, and the remainder in four (4) equal monthly installments on September 15, 1961, October 15, 1961, November 15, 1961, and December 15, 1961.

      *      *      *      *      *      *      *

(7) Times-Mirror Broadcasting Company warrants that it is the owner of all right, title and interest in the series and in the title and format and as such has the right to assign all such property to Storer Broadcasting Company. Further, Times-Mirror Broadcasting Company agrees to hold Storer Broadcasting Company harmless from any and all claims relating to any breach of the warranty mentioned in the preceding sentence, and from any and all claims against Storer Broadcasting Company as to its right, after the effective date of this agreement, to distribute and exhibit the aforesaid television series as the owner thereof.

Petitioner was not a party to the agreement between KTTV and Storer Broadcasting Co. There was presented to him a release to Storer Broadcasting Co., but he never executed the release. During the course of the negotiations between KTTV and Storer Broadcasting Co., petitioner was informed of the price which was being considered in the negotiations. His discussions were with Robert Breckner. Petitioner's approval of the negotiations was not specifically requested.

In March 1962 petitioner received a check for $40,728.67 from KTTV accompanied by a letter which stated:

We enclose our check drawn in your favor in the sum of $40,728.67 for the balance due you for services in connection with the "Divorce Court" TV series sold to Storer Broadcasting Company. The amount reflects the usual deductions, including that for income tax withholding.

On the previous payments which petitioner had received from exhibitions or leasing of the "Divorce Court" series there had been income tax withholding deductions made by KTTV.

At the time Storer Broadcasting Co. was negotiating for the purchase of the "Divorce Court" series, the negotiators on behalf of that company knew that petitioner was the producer and writer of the program. Petitioner's name appears on every show. At the time Storer Broadcasting Co. was negotiating for the purchase of the "Divorce Court" series that company did not solicit petitioner's services to produce the series for it. There were at the time of the sale approximately 160 tapes of shows ready for exhibition. At the time of the trial of this case petitioner was engaged in producing the "Divorce Court" series show for Storer Broadcasting Co.

The sales price paid by Storer Broadcasting Co. to KTTV for the series "Divorce Court" was $1,105,000. The expenses of the sale were $108,614.40, leaving a profit of $996,385.60. KTTV determined that petitioner was entitled to 5 percent of the profit which it computed to be $49,819.28.

On the income tax return of KTTV, the transaction whereby the series "Divorce Court" was sold to Storer Broadcasting Co. was reported as giving rise to capital gain, and the $49,819.28 paid by KTTV to petitioner was treated as a deduction from the gross receipts by KTTV from the sale of "Divorce Court."

Petitioner on his income tax return for the calendar year 1962 reported as a long-term capital gain the amount of $49,819.28 which he described as being received from "Sale of Property Interest 'Divorce Court.' "

Respondent in his notice of deficiency increased petitioner's income as reported by the amount of $49,819.28 designated as "salary" and reduced the income after such increase by the amount of $24,909.64 with the following explanation:

It is determined that the amount of $49,819.28 reported by you as capital gain to the extent of 50% thereof, or $24,909.64, in the year 1962 is ordinary income. Your ordinary income is accordingly increased $49,819.28 and capital gain is decreased $24,909.64.

### OPINION

Section 1201 of the Internal Revenue Code of 1954 [1] provides for special tax treatment of capital gain which is defined in section 1222 as the gain from the sale or exchange of a capital asset.

Section 1221 [2] defines a capital asset as property held by the tax-

---

[1] All references are to the Internal Revenue Code of 1954.

[2] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

(3) a copyright, a literary, musical, or artistic composition, or similar property, held by—

(A) a taxpayer whose personal efforts created such property, or

(B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property;

payer with certain exceptions, one of which is a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer whose personal efforts created such property.

Petitioner takes the position that the amount he received from KTTV upon the sale of the television series "Divorce Court" is taxable as capital gain under these provisions. He contends that he acquired a proprietary interest in the television series "Divorce Court" which was property, that this property was not similar to a copyright, a literary, musical, or artistic composition, or if it were, it was not created by petitioner's personal efforts, that his property was sold by KTTV on his behalf, and that as a result of such sale he received a capital gain of $49,819.28.

Petitioner bases his contention that he acquired a proprietary interest in the series "Divorce Court" on his oral agreement with KTTV as augmented by the memorandum of August 1, 1958, which provided that petitioner was to receive 5 percent of the net profits accruing to KTTV as a result of any multimarket sale of any program to which he was permanently assigned.

Petitioner further contends that since the idea of "Divorce Court" originated with KTTV and his personal efforts went only into the writing and directing of the series, the series was not created by his personal efforts.

Respondent contends that the only right which petitioner acquired in the television series "Divorce Court" was a right to share in the profits from any exhibition, lease, or sale of the series, that this right was received by petitioner as compensation for services and was not a property right of the type that constitutes a capital asset.

Respondent further takes the position that if petitioner's rights with respect to the "Divorce Court" series were to be considered as a property right of a nature which otherwise could constitute a capital asset, such property is not a capital asset because of the exclusion of section 1221(3) from capital assets of property similar to a literary, musical, or artistic composition held by a taxpayer whose personal efforts created the property.

Respondent also contends that even if petitioner's interest in the "Divorce Court" series were a capital asset which did not constitute property similar to a literary, musical, or artistic composition created by petitioner's personal efforts, the payment received by petitioner was not received as the result of a sale or exchange of this property interest.

We agree with respondent's position in all respects. Whatever the nature of the 5-percent interest received by petitioner, this 5-percent interest was received as compensation. Petitioner apparently distinguishes between his regular weekly salary and the 5-percent interest

he was to receive since the salary was for his servicies generally and the 5-percent interest was as an inducement to work on the properties. Why he considers the latter not to be compensation, petitioner does not explain. Generally, compensation in whatever form paid, is paid as an inducement to the payee to work. We consider the 5-percent interest received by petitioner to have been received as compensation.

In support of his position that even if the 5-percent interest he received in the "Divorce Court" series was received as compensation, it was nevertheless a capital asset received in 1958 and sold in 1961, petitioner relies on *Robert Lehman,* 17 T.C. 652 (1951). This is the only case cited or relied on by petitioner in his briefs. *Robert Lehman, supra,* involved the tax liability of a partner in a firm which had received as compensation for services, options to purchase stock. The partnership bought the shares under the options. The shares were subject to restrictions and the parties in the *Lehman* case agreed "that the acquisition of the shares did not give rise to any income (compensation for services)" in the year that the shares were purchased "because they had no ascertainable fair market value due to the restrictions." Respondent contended that the taxpayer in the *Lehman* case received ordinary income in the amount of the excess of the fair market value of the stock on the date the restrictions terminated over the cost of the stock and capital gain to the extent the sales price received for the stock a few months later exceeded the fair market value used as the basis for determining the ordinary income received. We held that the termination of restrictions was not a taxable event and that the taxpayer in the *Lehman* case correctly reported as capital gain the excess of the sales price received for the stock when he sold it over the amount he had paid for the stock. The only applicability that the *Lehman* case could have to this petitioner's case is that there is inherent in the conclusion reached in the *Lehman* case the proposition that stock received as compensation for services may be a capital asset in the hands of the recipient. Had petitioner in the instant case received stock in some year prior to the taxable year here in issue, there would be a different problem involved in this case. One of the problems here involved is what was the nature of the 5-percent interest petitioner received in the "Divorce Court" series as part of his compensation.

From the facts in this case we conclude that the interest petitioner received was a right to receive 5 percent of the net profits accruing to KTTV from certain uses or dispositions of the series. The written memorandum agreement specifically refers to 5 percent of the "profits." Petitioner's understanding that he was to acquire a right he could assign or sell or as he stated at one point in his testimony "a vested interest" does not establish that his right was to be other than a right

to a share of the profits. Certainly, a right to share in profits is assignable absent some agreement to the contrary. Our conclusion that petitioner had only a right to share in the profits to KTTV from the "Divorce Court" series is supported not only by the memorandum agreement but also by the actions of petitioner and KTTV with respect to petitioner's interest. A contract governing petitioner's employment by KTTV as drafted but not signed provided for a profit participation only. No contract revised to provide otherwise was ever executed. KTTV withheld Federal income taxes from the payments made to petitioner of 5 percent of the net profits from the exhibition and lease of the "Divorce Court" series as well as from the payment to petitioner of 5 percent of the net proceeds from the sale of the series. Petitioner apparently acquiesced in these withholdings, indicating that he did not consider KTTV as his agent collecting amounts received for a use of his property. Petitioner knew of the negotiations between KTTV and Storer Broadcasting Co. and did not attempt to become a party thereto or object to the sale's being made without his being a party. All these actions indicate that petitioner considered his 5-percent interest to be a profit-participation interest and not an ownership interest in the series.

As indicated in our discussion of the nature of petitioner's 5-percent interest in the "Divorce Court" series, a right to participate in profits is a type of property interest. However, we agree with respondent that it is not property of a type that constitutes a capital asset within the meaning of section 1221. As stated in *Commissioner* v. *Gillette Motor Transport, Inc.*, 364 U.S. 130 (1960), "it is evident that not everything which can be called property in the ordinary sense * * * qualifies as a capital asset." The right to participate in the profits received by KTTV from the "Divorce Court" series was a right in which petitioner had no investment or cost basis as was the right to use of facilities being considered by the Court in *Commissioner* v. *Gillette Motor Transport, Inc., supra.* While KTTV owned the "Divorce Court" series and exhibited or leased it, petitioner treated the 5 percent of the net profits he received as ordinary income. When KTTV sold the series, the 5 percent of the net sales price received by petitioner was a substitute for his right to continue to receive 5 percent of the net income of KTTV from the series and as such took on the nature of that for which it substituted and constituted ordinary income. Where the right to participate in profits was originally received as compensation for services, a termination of such right merely commutes into a lump sum estimated future income. *Herman Shumlin*, 16 T.C. 407 (1951), and *Nat Holt*, 35 T.C. 588 (1961), affd. 303 F. 2d 687 (C.A. 9, 1962). Cf. *Ralph Bellamy*, 43 T.C. 487 (1965). We conclude that petitioner's interest in the "Divorce Court" series

was not a capital asset within the meaning of section 1221 and disposition of that interest did not result in a capital gain.

Even if petitioner's interest in the "Divorce Court" series could be considered as a capital asset within the meaning of section 1221, we agree with respondent that the facts here fail to show that petitioner made a sale or exchange of that interest.

The facts do not support petitioner's contention that KTTV made a sale to Storer Broadcasting Co. on behalf of petitioner of his interest in the "Divorce Court" series. The record shows that only KTTV and Storer Broadcasting Co. were parties to the sales agreement. KTTV gave a warranty of title to Storer Broadcasting Co. Petitioner made no sale to Storer Broadcasing Co. of any interest in the "Divorce Court" series. If any sale or exchange of any interest petitioner had in the "Divorce Court" series occurred, such sale or exchange was between KTTV and petitioner. However, the facts show that after KTTV sold the series "Divorce Court" petitioner received a payment from KTTV in accordance with his employment agreement with KTTV. This conclusion is supported by the actions of both petitioner and KTTV with respect to the payment. Such a payment is not an amount received from the sale or exchange of a capital asset. See *Gordon* v. *Commissioner*, 262 F. 2d 413 (C.A. 5, 1958), affirming 29 T.C. 510 (1958).

Finally, we agree with respondent that if the interest petitioner acquired in "Divorce Court" were a property interest of a type that might otherwise be considered a capital asset, it would not qualify as a capital asset because of the exclusion from the definition of capital asset by section 1221(3) of literary, musical, or artistic compositions, or similar property held by a taxpayer whose personal efforts created such property. A television production is property similar to a literary, musical, or artistic composition and as such comes within the exclusion of section 1221(3). *Kurlan* v. *Commissioner*, 343 F. 2d 625 (C.A. 2, 1965), affirming a Memorandum Opinion of this Court. The facts here show that petitioner's personal efforts were primarily responsible for the creation of the "Divorce Court" series. Of course, others also contributed to the creation of the property. The idea for the series originated with KTTV. The actors and supporting personnel contributed to the production. Nevertheless petitioner's personal efforts in writing and producing the series created the property. The facts here show that petitioner's method of writing and producing the "Divorce Court" series was the most important element of the show and was largely responsible for its success. Petitioner created the property as an employee of KTTV under an employment agreement which we have concluded was such that KTTV became the sole owner of the series. The fact that because of petitioner's employment

by KTTV, the property which was created by his personal efforts belonged to KTTV, does not cause the property not to have been created by his personal efforts. Therefore, if petitioner could be considered to have any property interest in the "Divorce Court" series, such property would not constitute a capital asset because of the exclusion from the definition of capital asset provided for in section 1221 (3).

We sustain respondent in his determination that the $49,819.28 received by petitioner from KTTV representing 5 percent of that company's net profit from the sale of the "Divorce Court" series constituted ordinary income.

*Decision will be entered for respondent.*