378 F.2d 222
 67-1 USTC P 9461
 MURPHY LOGGING CO., successor by merger to Murphy Timber
Co., Harry C. Murphy and Dorothy Shea Murphy,
Edward J. Murphy and Virginia C. Murphy,
Peter C. Murphy and Dorothy Z.
Murphy, Appellants,
v.
UNITED STATES of America, Appellee.
 No. 20281.
 United States Court of Appeals Ninth Circuit.
 May 15, 1967.
 
 Charles P. Duffy, Joyle C. Dahl, Duffy, Stout & Georgeson, Portland, Or., for appellants.
 Richard M. Roberts, Acting Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Richard J. Heiman, Gilbert Andrews, Attys., Tax Div., Dept. of Justice, Washington, D.C., Sidney I. Lezak, U.S. Atty., Portland, Or., for appellee.
 Before CHAMBERS, POPE and HAMLEY, Circuit Judges.
 CHAMBERS, Circuit Judge:
 
 
 1
 Harry, Edward and Peter Murphy know the logging business pretty well. But in their apparent quest for federal income tax savings, they have collided with the internal revenue service.
 
 
 2
 The Brothers Murphy have operated as loggers in the timber lands of Oregon for some time. Today considerable equipment is usually required in that sort of business.
 
 
 3
 Before the tax years in controversy, the Murphy brothers operated for a long time as a partnership. In 1958 they added a corporation. The partnership was called Murphy Timber Co. and the corporation was called Murphy Logging Co. Hereafter we shall refer to them as the Murphy partnership and Logging, Inc. A valuable intangible of the Murphys was their ability to get contracts for cutting timber from the Crown-Zellerbach Corporation.
 
 
 4
 Murphy partnership was owned 53 1/3% By Harry, 33 1/3% By Edward and 13 1/3% By Peter, the disparities conformed in some respect to the age of the brothers. Harry seems to have been the lead man in the enterprises.
 
 
 5
 The ratio of ownership in Logging, Inc., was equal. Logging, Inc., after it was organized, did the business for the brothers with others and it was the operator in the field on logging contracts. Murphy partnership owned the logging equipment and leased it to Logging, Inc., for about the amount of the annual depreciation.
 
 
 6
 From April, 1958, to April 1959, the Zellerbach contract was with Logging, Inc. for logging near Grand Ronde, Oregon. In the fall of 1958, Logging, Inc., added another logging contract 100 miles away st Santiam, Oregon, with the Santiam Lumber Co. This required more machinery, and Logging, Inc. purchased it from Santiam for that operation.
 
 
 7
 In the spring of 1959, the time was approaching for a new annual contract with Zellerbach. The Murphy brothers decided they should have a new company to do business with Zellerbach, leaving Logging, Inc., as the operator of the Santiam contract. So they incorporated Murphy Timber Co. (hereafter Timber, Inc.).
 
 
 8
 One Murphy setup was as good as another for Zellerbach. In April, 1959, Murphy Timber, Inc., obtained a new one year Zellerbach contract to be performed in the Grand Ronde area as before. The concept of forming Timber, Inc., was that the Murphy partnership would sell its logging equipment to Timber, Inc., for a price to be later determined by an independent appraiser. There would be no more leasing from the partnership. (Each of the three brothers subscribed and paid for a nominal amount of stock of Timber, Inc.: $500 each. No other stock was issued.)
 
 
 9
 The agreement to sell the equipment was made shortly after Murphy Timber, Inc., was formed. In the fall of 1959 the appraisement was made. And the value of the equipment was fixed at $238,150. (Parenthetically we find the appraiser's testimony quite amusing as he relates how he was coaxed by the oldest brother to keep the value up and by the youngest to keep it down. This represents a struggle by Peter, the youngest, to get on a parity with his brothers at the earliest date possible.)
 
 
 10
 Obviously, $1,500 received from the issuance of stock would not pay for the equipment. It may be assumed that someone advised the Murphys that taxwise it was dangerous to have the Murphy partnership wait until Timber, Inc. earned enough profit from operations to pay the debt, either in installments or all at once. 'Thin capitalization,' we assume, was sought to be avoided by having the corporation borrow the money from a third party: The First National Bank of Oregon.
 
 
 11
 It would appear that the equipment sold to Timber, Inc. by the partnership had either greatly appreciated in value or had been depreciated faster than its useful life was expiring. Clearly one motivation for the new setup must have been to get a new tax basis on the machinery to start depreciating again. Tax reduction is not evil if you do not do it evilly. Often an inefficient operator, wise as to taxes, can do better than an efficient operator who is stupid about his taxes.
 
 
 12
 When the revenue agents looked at the lush new depreciation of Timber, Inc., they decided to go agter the company and the Murphys individually. They discovered that when Timber, Inc., borrowed $240,000 about December 31, 1959, for immediate payment of the debt to the Murphy partnership, that the Murphy brothers had individually guaranteed the note.
 
 
 13
 The collectors recast the transaction as a tax free exchange between the partnership and Timber, Inc., disallowed the stepped up depreciation base of Timber, Inc. on the equipment. And, further, they held the payment with money borrowed from the bank for the equipment to be a constructive dividend to the partners.
 
 
 14
 The Murphys elected to pay the asserted deficiency and sue for it back. The district court sustained the internal revenue service. On this appeal, we disagree.
 
 
 15
 When taxpayers have used pure gimmicks of form to shield the real essence of a transaction, we have not hesitated to approve or order recasting for tax purposes of a transaction. See Estate of Starr v. Commissioner, 9 Cir., 274 F.2d 294, and our Oesterreich cases: Oesterreich v. Commissioner, 9 Cir., 226 F.2d 798; Commissioner v. Wilshire Holding Corp., 9 Cir., 244 F.2d 905, 262 F.2d 51, and 288 F.2d 799.
 
 
 16
 The cases on 'thin' capitalization are quite varied as to facts and therefore conversion of what went into a corporation into equity capital by the commissioner must be considered on a case to case basis. At the time of trial at least, the government conceded that this was the first case of its type. The government called it indirect borrowing by the Murphys.
 
 
 17
 As we read the trial transcript, if the Murphys individually had been worthless (instead of affluent in personal assets) and the bank had still made the loan, then the taxpayer might have been better off in contesting with the agents in so far as the obligation to the bank was concerned, but we do not think that they should be penalized here for responsibility. Also, we find it an oversimplification to look only to the nominal stated capital of Timber, Inc. in determining the value of the Murphys' equity investment. Estate of Miller v. C.I.R., 9 Cir., 239 F.2d 729; United States v. Cornish, 9 Cir., 348 F.2d 175, 182.[1] In addition to putting $1,500 into the new operation, the Murphys also contributed the expectancy of future custom from Zellerbach as well as their own integrity and reputation for getting things done. These latter assets are extremely important in the logging business generally. Here they may well have been more valuable than the tangible machinery. In any case, we hold that they were adequate to prevent the corporation from being treated as 'thinly' capitalized.
 
 
 18
 Thus, we are unwilling to collapse the transaction by saying that the bank loan of $240,000 to the corporation was really to the individual stockholders. And, so we are unable to go on and say the sale of the machinery to Timber, Inc., was a tax free contribution of equity capital by the Murphy partnership to Timber, Inc. under Sec. 351 of the Internal Revenue Code of 1954. Without the assumptions we have rejected, there is no basis for denying Timber, Inc. its interest charges paid to the bank and depreciation on the new basis; and, so the payments for the equipment by Timber, Inc., to the Murphy partners should not be constructive dividends.
 
 
 19
 The judgment is reversed.
 
 
 
 [1]
 In Haley v. United States, D.C.Ore., 5 AFTR2d 365 (not officially reported), where $50,000 was loaned to a newly formed logging corporation which only had $3,000 of stated capital, the existence of a logging contract was considered by the trial judge in arriving at the conclusion that the corporation was adequately capitalized