*Decisions will be entered under Rule 50.*

R. M. EDWARDS AND DOROTHY EDWARDS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

LOYD W. DISLER AND JOY DISLER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2369–66, 2388–66.   Filed May 2, 1968.

*William A. Goffe,* for the petitioners.
*J. C. Linge,* for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioners' joint income taxes as follows:

| R. M. EDWARDS AND DOROTHY EDWARDS (docket No. 2369–66) | | LOYD W. DISLER AND JOY DISLER (docket No. 2388–66) | |
| --- | --- | --- | --- |
| Year | Deficiency | Year | Deficiency |
| 1962 | $3,375.68 | 1962 | $3,010.00 |
| 1963 | 11,968.08 | 1963 | 11,436.23 |
| 1964 | 5,714.48 | 1964 | 5,375.43 |

Both dockets were consolidated for trial and decision. Petitioners having conceded certain adjustments made by respondent, the sole issue remaining for decision is whether amounts received by petitioners on the principal of alleged corporate promissory notes are amounts received in exchange for indebtedness and therefore taxable as capital gains under section 1232(a)(1)[1] or as distributions under sections 301 and 316 and therefore taxable in whole or in part as ordinary income.

---

[1] All references are to the Internal Revenue Code of 1954, as amended.

FINDINGS OF FACT

Some of the facts have been stipulated. These facts and the exhibits attached thereto are incorporated herein by this reference.

R. M. Edwards (hereinafter sometimes referred to as Edwards) and Dorothy Edwards are husband and wife, as are Loyd Disler (hereinafter sometimes referred to as Disler) and Joy Disler, and had their legal residences in Tulsa, Okla., at the time of the filing of the petitions herein. Both couples filed their joint Federal income tax returns for the years here involved with the district director of internal revenue, Oklahoma City, Okla.[2]

In 1958, petitioners organized a corporation, Disler Engineering Corp. (hereinafter referred to as Disler Engineering), for the purpose of manufacturing and selling heat exchangers. Edwards' duties were primarily in the financial and management areas, while Disler's basically covered the engineering and sales areas. Until June 1962, the business was conducted in a leased plant located on Sand Springs Road in Sand Springs, Okla., and consisted of the assembling, finishing, and selling of heat exchangers made from parts fabricated by Patterson Steel Co. The company had prospered, with gross sales increasing from approximately $72,000 in 1958 to $1,266,212.85 in 1962 and had outgrown its facilities on Sand Springs Road. Unable to expand at that location, petitioners in 1961 began looking for a place to move Disler Engineering.

Birmingham Steel & Supply, Inc. (hereinafter referred to as Birmingham Steel), is an Oklahoma corporation organized in 1949. Its plant was also located on leased premises in Sand Springs, Okla. From 1959 to 1962, it operated as a fabricator of structural steel, including parts for heat exchangers, and also conducted a steel warehouse supply business. The steel supply business, which required a larger inventory and more working capital than did the fabricating business, had proved to be very unprofitable. In 1962, Birmingham Steel was phasing out this portion of its business.

Prior to 1962, Ovid Birmingham owned 76 percent of the issued and outstanding shares of Birmingham Steel. Sometime around February or March of 1962, he and the other stockholders decided to sell the Birmingham Steel business. Thereafter and prior to June 1962, Ovid Birmingham acquired all the stock in the hands of other stockholders. On June 12, 1962, Edwards and Disler, who had been contacted as prospective purchasers on the same day by one Stainer (an attorney and secretary of Birmingham Steel) and at Stainer's invitation, inspected

---

[2] Dorothy Edwards and Joy Disler are parties to this proceeding solely by reason of having filed joint returns with their husbands; hereinafter, the term "petitioners" will refer only to the husbands.

the Birmingham Steel facilities, machinery, and equipment. When the inspection was concluded, Stainer asked Edwards to express an opinion on the worth of the entire plant and equipment and Edwards stated an amount of $75,000. At that time, Edwards knew nothing about the financial condition of Birmingham Steel.

Stainer immediately advised Ovid Birmingham that Edwards and Disler were interested in buying the plant for $75,000. Two days later, Stainer advised Edwards that the offer of $75,000 was accepted. Edwards replied that the $75,000 figure quoted by him was not intended as an offer, but agreed to consider making an offer after looking at the books and records of the company, including a balance sheet, so as to see what debts existed. Petitioners then went with Stainer to the Birmingham Steel office where they met Ovid Birmingham for the first time and were supplied with the following abbreviated financial statement of the business as of that time.

ESTIMATED CONDITION OF BIRMINGHAM STEEL & SUPPLY, INC., SUBJECT TO AUDIT

*Liabilities*

| | |
|---|---:|
| Vouchers payable | $65,526.00 |
| Accrued payroll | 6,712.44 |
| Accrued withholding and social security T4 | 2,661.17 |
| Chattel mortgage on machinery and equipment | 581.99 |
| Notes payable—National Bank of Tulsa—secured by accounts receivable | 20,417.58 |
| Total liabilities | 95,899.18 |

*Assets*

| | |
|---|---:|
| Current assets: | |
| Cash | 3,923.93 |
| Accounts receivable less reserve for bad debts | 37,727.75 |
| Inventory | 110,000.00 |
| Total current assets | 151,651.68 |
| Fixed assets: | |
| Machinery, equipment, tools, furniture, fixtures, etc.—book value Dec. 31, 1961 | 93,041.30 |
| Total assets | 244,692.98 |

Petitioners considered the above statement and concluded that they would in fact be willing to pay $75,000 for the plant. They contemplated that Birmingham Steel would perform the prefabrication work on the heat exchangers previously done for Disler Engineering by Patterson Steel, thus enabling an expansion of this phase of the business. Petitioners also felt that they could utilize all the equipment in the Birmingham Steel plant, thereby meeting their general expansion needs.

On June 14, 1962, petitioners, accompanied by their accountant, Robert Bridges, and two other employees of Disler Engineering, resumed negotiations at the Birmingham Steel office. Bridges examined the books and records of Birmingham Steel to determine whether the financial statement previously furnished to petitioners was correct. The other two employees examined the inventory of Birmingham Steel. Ovid Birmingham desired to sell the entire business of Birmingham Steel. Negotiations centered around a sale by him to petitioners of all the issued and outstanding stock of the company. Petitioners offered to purchase all such stock for $75,000 based upon the financial statement they had received. It was then suggested that a letter of intent be prepared to reflect the agreement of the parties.

Letters of intent were prepared by Stainer but, before they were signed, Bridges discovered that the financial statement furnished petitioners did not reflect outstanding promissory notes of Birmingham Steel in the amount of $241,904.82. The notes held by Ovid Birmingham stood as follows at June 14, 1962:

| Date of note | Face amount | Collateral | Interest | Due date |
|---|---|---|---|---|
| 3/17/61 | $3,000.00 | None | No | Demand. |
| 4/ 1/61 | 106,904.82 | None | No | 4/1/62. |
| 6/19/61 | 500.00 | None | No | Demand. |
| 12/18/61 | 15,000.00 | None | Yes | 12/18/62. |
| 2/20/62 | 26,500.00 | Machinery | Yes | 12 months installment. |

Also as of June 14, 1962, Birmingham Steel had an outstanding note payable to the National Bank of Tulsa in the amount of $90,000. This note had originally been executed on August 14, 1961, to be due in 91 days; but it had been extended so that, at the time of the negotiations, the due date was August 13, 1962. The note was secured by 2,823 shares of Texaco, Inc., common stock owned by Ovid Birmingham and his personal guaranty. The corporation's note payable to the bank was canceled on June 15, 1962, upon execution by Ovid Birmingham of a personal note to the bank for $90,000 secured by the Texaco stock. At the same time, Birmingham Steel executed its own unsecured note to Ovid Birmingham for $90,000, due in 90 days and bearing interest at the rate of 5½ percent per annum.

The above notes (including the one replacing the note payable to the National Bank of Tulsa) had been issued to Ovid Birmingham as evidence of several temporary advances of funds made by him to Birmingham Steel. At the time Ovid Birmingham loaned such funds, he intended them to be temporary advances and not additional permanent investments of capital, his expectation being that Birmingham Steel would make enough money to repay him for his advances. The notes were not subordinated to other obligations of Birmingham Steel.

Those advances represented by the notes dated December 18, 1961, and June 15, 1962, had been borrowed by Ovid Birmingham from the National Bank of Tulsa, such borrowings being secured by Texaco stock, as previously indicated, and by 400 shares of Standard Oil Co. of Ohio stock also owned by Ovid Birmingham. The advanced funds covered by the note dated February 20, 1962, had been borrowed by Ovid Birmingham from Morris Plan of Oklahoma. During 1961 and part of 1962, stockholders of Birmingham Steel other than Ovid Birmingham had advanced no funds to the corporation.

The funds borrowed by Birmingham Steel from Ovid Birmingham were used for operating expenses and inventory and were reflected as outstanding debts on the corporate books, records, and income tax returns and on financial data furnished to Dun & Bradstreet. The notes were not included in the abbreviated financial statement made available to Edwards and Disler because it was thought that this would discourage potential purchasers.

The letter of intent, which was signed by Edwards and Disler on June 14, 1962, stated as follows:

This letter will confirm our offer to purchase from you all of the outstanding stock issued by Birmingham Steel & Supply, Inc., an Oklahoma corporation, for the purchase price of $75,000.00, and this letter may be used as a letter of intent for said purchase. It is understood and agreed, however, that this purchase is subject to the approximate correctness of an estimated financial statement of said Corporation which was issued by you, said statement listing total liabilities in the approximate amount of $95,899.18, total current assets in the approximate amount of $151,651.68, and total fixed assets in the approximate amount of $93,041.30, and further realizing there might be a slight difference, either plus or minus, to said accounts. To include assignment of notes payable executed by Company to Seller.

Birmingham executed a substantially identical letter of intent. The last sentence, referring to the assignment of the notes, was handwritten and added at the time of signing to reflect Bridges' discoveries.

On June 15, 1962, the parties executed and closed a contract prepared by Stainer, providing for sale of the stock and notes of Birmingham Steel (including the note executed by Birmingham Steel to Ovid Birmingham on June 15, 1962) to petitioners, who agreed to pay $5,000 for the stock and $70,000 for the notes. Ovid Birmingham agreed to deliver to petitioners the stock certificates and the notes endorsed without recourse in exchange for $1,000 at the closing and a promissory note for $74,000, payable in 120 monthly installments of $821.55 each, including interest at the rate of 6 percent.

The allocation of the purchase price was made either by Stainer or Griffith Baxter (who prepared the Birmingham Steel tax returns). Neither petitioners nor Bridges suggested the allocation. Ovid Birmingham was anxious to dispose of Birmingham Steel before the com-

pany incurred further operating losses; it made no difference to him how the sale was accomplished, so long as he received the amount of $75,000. Petitioners understood that they were purchasing the stock for $5,000 and the notes for $70,000 and that the notes remained outstanding obligations of Birmingham Steel.

Birmingham Steel had net income of $22,111.20 in 1956 and $47,339.19 in 1957; it incurred losses of $2,585.66 in 1958, $59,750.85 in 1959, $70,234.39 in 1960, and $42,870.57 in 1961.

The liabilities and capital account of Birmingham Steel at various dates is represented by the following table:

|  | 12/31/59 | 12/31/60 | 12/31/61 |
|---|---|---|---|
| *Liabilities* | | | |
| Accounts payable | $82, 374. 59 | $73, 933. 66 | $83, 031. 31 |
| Bonds, notes, mortgages payable | 277, 237. 05 | 245, 981. 75 | 315, 635. 13 |
| Accrued expenses: | | | |
| Accrued payroll | 4, 117. 79 | 9, 611. 57 | 11, 210. 97 |
| Accrued taxes | 5, 290. 96 | 6, 641. 66 | 8, 270. 66 |
| Accrued interest | 62. 50 | 52. 99 | |
| Total liabilities | 369, 082. 89 | 336, 221. 63 | 418, 148. 07 |
| *Capital* | | | |
| Common stock | 102, 550. 00 | 102, 550. 00 | 102, 550. 00 |
| Earned surplus (or deficit) | (65, 132. 19) | (117, 178. 27) | (160, 679. 84) |
| Total capital | 37, 417. 81 | (14, 628. 27) | (58, 129. 84) |

After taking over Birmingham Steel, petitioners discontinued the steel supply business, letting Birmingham Steel take over the fabricating work on heat exchangers previously done by Patterson Steel. Disler Engineering became the sales and engineering corporation, with Birmingham Steel becoming strictly a manufacturing corporation. Birmingham Steel's sales rose to $557,261.79 in 1962, $1,900,844.38 in 1963, and $3,192,437.17 in 1964. Disler Engineering's taxable income also increased during the same period to $22,934.38 in 1962, $74,449.21 in 1963, and $103,161.28 in 1964.

For the years in issue, Birmingham Steel reported net income (before application of net operating loss carryovers) and earned surplus balances (as of December 31) in the following amounts:

| Year | Net income | Earned surplus |
|---|---|---|
| 1962 | $14, 490. 08 | ($145, 509. 76) |
| 1963 | 82, 486. 74 | (28, 112. 82) |
| 1964 | 191, 109. 63 | 73, 529. 00 |

During the years involved herein, Birmingham Steel paid the following amounts as repayments on the notes which had been assigned to petitioners by Ovid Birmingham:

| Year | Edwards | Disler |
|---|---|---|
| 1962 | $10, 952. 41 | $10, 952. 41 |
| 1963 | 50, 000. 00 | 50, 000. 00 |
| 1964 | 15, 000. 00 | 15, 000. 00 |

By 1966, Birmingham Steel had paid the notes in full. The expansion in its business during 1962, 1963, and 1964 was achieved without further additions to its capital; and, with the exception of accrual items and trade accounts payable, there were substantial reductions in indebtedness during these same years.

Payments on the notes received by petitioners in 1962 (a total of $21,904.82) were treated as a return of capital and were not reported on petitioners' tax returns. In 1963, they reported $28,700 as return of capital and the balance ($71,300) as long-term capital gain. In 1964, $19,395.18 was reported as return of capital and the balance ($10,604.82) as long-term capital gain.

Respondent, in his notices of deficiency, determined that all payments in 1962, 1963, and 1964 were distributions with respect to stock and that the amounts received by petitioners were includable as ordinary income to the extent of the earnings and profits of Birmingham Steel in each of the respective years.

### ULTIMATE FINDING OF FACT

The promissory notes in issue constituted valid outstanding indebtedness of Birmingham Steel in the hands of Ovid Birmingham but did not retain such character when purchased by petitioners.

### OPINION

Petitioners purchased Ovid Birmingham's entire interest in Birmingham Steel Corp. for a total price of $75,000. Such interest was represented by Ovid's 100-percent stock ownership plus his purported creditor status with respect to some $240,000 of alleged promissory notes owed him by the corporation. The purchase contract allocated $70,000 of the price to the notes and $5,000 to the stock. Subsequently, petitioners received payments purportedly in retirement of the notes and it is their contention that such payments were taxable as amounts received in exchange for an indebtedness within the intendment of section 1232(a)(1) of the 1954 Code.[3] The basic thrust of that section is to designate payments in retirement of certain "evidences of in-

---

[3] SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS.

(a) GENERAL RULE.—For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof—

(1) RETIREMENT.—Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954).

debtedness" as having been received in an "exchange," usually resulting in capital gains or loss treatment.

Respondent argues that the payments are instead taxable as dividends under sections 301 and 316.[4] He urges that the funds represented by the purported notes were, in reality, capital contributions by Ovid to the corporation and that, consequently, in purchasing such notes, petitioners actually acquired equity interests. Alternatively, he contends that, even if we were to characterize the notes as bona fide indebtedness in the hands of Ovid, such characterization should not automatically carry over to petitioners via their purchase. Thus, respondent insists that petitioners never negotiated for the notes per se and, at all times, intended them to represent contributions to the capital of the corporation.

The question involved in respondent's first contention is essentially one of fact, with the burden of proof upon the taxpayer. *Gilbert* v. *Commissioner*, 262 F. 2d 512 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court; *Gooding Amusement Co.* v. *Commissioner*, 236 F. 2d 159 (C.A. 6, 1956), affirming 23 T.C. 408 (1954); *C. M. Gooch Lumber Sales Co.*, 49 T.C. 649 (1968). We think that, on the basis of the record before us, petitioners have carried their burden in this respect and we conclude, and have so found, that the notes in question constituted bona fide indebtedness in the hands of Ovid Birmingham. We see no reason to detail the various elements which led us to this factual conclusion, particularly since, in any event, we conclude that respondent should prevail on his alternative contention.

---

[4] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

\* \* \* \* \* \* \*

(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—

(1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

(2) AMOUNT APPLIED AGAINST BASIS.—That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock.

(3) AMOUNT IN EXCESS OF BASIS.—

(A) IN GENERAL.—Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property.

(B) DISTRIBUTIONS OUT OF INCREASE IN VALUE ACCRUED BEFORE MARCH 1. 1913.— That portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock and to the extent that it is out of increase in value accrued before March 1, 1913, shall be exempt from tax.

SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

We reject petitioners' assertion that if the notes were bona fide indebtedness in the hands of Ovid Birmingham, they automatically retained this character after the transfer. The nature of the instruments in the hands of petitioners, for tax purposes, is likewise a question of fact. There is no dispute as to the subsidiary factual elements involved. The dispute revolves around the ultimate factual determination to be made and we are satisfied that, on all the facts and circumstances herein, the notes did not constitute bona fide indebtedness after the transfer from Ovid to the petitioners.

Circumstances somewhat similar to those herein arose in *Jewell Ridge Coal Corporation* v. *Commissioner*, 318 F. 2d 695 (C.A. 4, 1963), affirming a Memorandum Opinion of this Court. There the taxpayer (Jewell) desired to purchase a railroad (Railroad) incident to its proposed operation of a coal mine. The purchase contract provided for acquisition of all existing Railroad stock plus assignment to the purchaser of Railroad's entire indebtedness (represented by notes and open account) to its three shareholders. At that time, the books of Railroad showed a substantial surplus and even the scrap or salvage value of Railroad's assets exceeded its liabilities by approximately $13,000. Of the $132,500 paid, $127,322.10 (or 96 percent) represented the face amount of such indebtedness and was allocated thereto and the remaining $5,177.90 (or 4 percent) was allocated to the stock. In a Memorandum Opinion denying petitioner's subsequent claim to a bad debt deduction for the amount of such indebtedness, we stated that—

in practical reality petitioner acquired the railroad by paying to or on behalf of its owners a total amount of $132,500, and in reality this sum represented petitioner's original cost of the railroad. The fact that the transaction was cast in a form which reflected an indebtedness of * * * [Railroad] to petitioner in the sum of $127,322.10 and a stock investment of only $5,177.90 (resulting in obviously thin capitalization of * * * [Railroad] should be disregarded in considering the realities of the situation for tax purposes. [*Jewell Ridge Coal Corp.*, T.C. Memo. 1962–194 (21 T.C.M. 1048, 1055.)]

In affirming, the Court of Appeals for the Fourth Circuit made the following comment which we think particularly relevant herein:

Even assuming the original obligation of $127,322.10 was a *debt* owing to * * * [the Railroad shareholders]—and this may be questioned for they were then the sole stockholders, with the bulk of their claim arising in much the same manner as Jewell's—it could readily be converted into capital in the Jewell acquisition. That would be the result, though unintended by Jewell, if the circumstances of the assumption by Jewell of the claim against the Railroad constituted in fact a capital investment. [318 F. 2d 695, 699.]

Similarly, we think it clear that the notes became part of the capital, and not bona fide indebtedness, of Birmingham Steel upon their

acquisition by petitioners herein.[5] Birmingham was in a substantial deficit position and the entire purchase price was only a fraction of the face amount of the notes. In this context, our determination herein follows *a fortiori* from *Jewell Ridge Coal Corporation, supra.* Beyond this, there is no escape from the essential fact that petitioners' prime objective at all times was to acquire the physical assets of Birmingham Steel. Their original intention was to pay $75,000 towards this end— i.e., the amount they considered the assets to be worth in an *unencumbered* state. Only at the last minute did they learn of the outstanding corporate notes to Ovid Birmingham. Such notes were hastily thrown in with the deal. The acquisition was still consummated at the initially contemplated price of $75,000, there never being any suggestion that the assignment of the notes warranted any additional consideration.

It may be argued that *Jewell Ridge* can be distinguished on the ground that the notes involved were not considered bona fide indebtedness in the hands of the seller. Even assuming that such is the case, the rationale of both this Court and the Court of Appeals is crystal clear and we see no reason not to apply it to the facts herein. We also recognize that, if the ownership of the notes and the stock of Birmingham Steel had been separated, the notes being transferred to another party (or, for that matter, retained by Ovid Birmingham), we might well reach a different result. But, even assuming such would be the case, it has no bearing on the issue now before us. In such a situation, the notes could be considered as having an independent significance. For that matter, even where there is no separation of ownership, the notes nevertheless might be recognized as bona fide indebtedness if the facts and circumstances show that they were accorded independent significance—a situation which clearly was not present in the instant case.

That the operations of Birmingham Steel were subsequently financially successful should not be permitted to obscure the fact that, *as of the time of acquisition*, no debtor-creditor position between Birmingham Steel and petitioners could realistically be considered to exist. The casual treatment of the notes, and the complete lack of any independent significance attaching to them in the transaction speaks

[5] See also *Barclay Co.*, T.C. Memo. 1964-279, heavily relied upon by respondent, which case is substantially similar to the one herein both on its facts and legal context (i.e., sec. 1232(a)(1)). There, however, the alleged indebtedness was found as a fact to represent equity investment in the hands of the original holder. We went on to agree with respondent's further contention that "Solmonson and his group did not in substance purchase 'notes' * * * but made an additional equity investment." T.C. Memo. 1964-279 (23 T.C.M. 1695, 1709). It is not quite clear whether we would have reached the same result had the notes been found to represent valid indebtedness in the hands of the seller, although, in this regard, we note that *Jewell Ridge Coal Corporation* was cited with approval.

volumes. Repayment was dependent upon the complete turnaround of the business. Admittedly petitioners' *payments* were made to Ovid Birmingham and none of them found their way into the hands of Birmingham Steel. But this does not detract from the fact that the face amount of the so-called notes, which were thrown in with the stock for which the payments were made, was in the fullest sense "at risk." From petitioners' standpoint, the assignment of the notes served merely to remove substantial outstanding claims against the corporation whose stock they were acquiring. It in no way altered their constant and single-minded objective—i.e., to acquire the physical assets of Birmingham Steel through purchase of the outstanding equity interest. To hold otherwise would be to exalt form over substance. Cf. *Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affirmed per curiam 187 F. 2d 718 (C.A. 5, 1951). See also *J. A. Maurer, Inc.*, 30 T.C. 1273 (1958); *1432 Broadway Corp* v. *Commissioner*, 160 F. 2d 885 (C.A. 2, 1947), affirming 4 T.C. 1158 (1945).

In order to reflect certain concessions by petitioners,

*Decisions will be entered under Rule 50.*

Reviewed by the Court.

———

WITHEY, *J.*, concurring: I concur in the result reached by the majority in this case but cannot agree that assignment of Ovid's evidences of indebtedness to the taxpayer-petitioners as distinguished from Birmingham Steel can be construed as a contribution to the capital of the latter. It seems to me a necessary conclusion that this result must be arrived at on the basis of the fact that the evidences of indebtedness both in the hands of Ovid and in the hands of petitioners would constitute valid and subsisting evidences of indebtedness. That contrary to the situation where Ovid had made an investment (loan) in the notes, petitioners made no investment whatsoever. (To find other than that the $75,000 purchase price was paid solely for the physical assets of Birmingham flies in the face of this entire record.) Therefore it seems to me that although the evidences of indebtedness represented real debt by Birmingham, they were without investment consideration and therefore were not capital assets in the hands of petitioners and were not intended to be covered by section 1232 of the Code which requires as a preliminary to its application that such evidences of indebtedness be "capital assets in the hands of the taxpayer." *Commissioner* v. *Gillette Motor Transport, Inc.*, 364 U.S. 130; *Holt* v. *Commissioner*, 303 F. 2d 687 (C.A. 9); *Ralph Bellamy*, 43 T.C. 487; *Jackson Hill*, 47 T.C. 613. These payments seem to me to be ordinary taxable gain in their entirety.

———

FEATHERSTON, *J.*, dissenting: With due deference, I dissent.

Code section 1232(a)(1) provides that amounts received by the "holder" on the retirement of evidences of indebtedness, including notes, "shall be considered as amounts received in exchange therefor" if such evidences of indebtedness are "capital assets in the hands of the taxpayer." As a result of the June 15, 1962, transaction between petitioners and Ovid Birmingham, petitioners became holders of the Birmingham Steel notes which, the majority concedes, were evidence of bona fide debts in Ovid's hands. Such notes were capital assets in the hands of petitioners. Accordingly, as I view this case, section 1232(a)(1) compels the conclusion that payments of the notes shall be "considered as amounts received in exchange therefor."

The majority opinion holds that the notes payable to Ovid Birmingham when assigned to petitioners became equity despite what I believe to be petitioners' intent to the contrary. Further, the majority arrives at its conclusion that the notes became equity in the hands of petitioners despite the fact that the notes were valid debts in the hands of Ovid Birmingham; despite the fact that the notes would have been valid debts in the hands of third parties or if retained by Ovid Birmingham; despite the fact that Birmingham Steel had no need for additional capital; despite the fact that respondent concedes the sale was a bona fide, arms-length transaction; and, I assume, despite the fact that the notes would have been evidence of bona fide indebtedness in the hands of a third party if petitioners had transferred, rather than collected, the notes following the June 15, 1962, transaction.

One may wonder what it is that gave these pieces of paper the chameleonlike ability to change character as they traveled from hand to hand. The majority says they were equity because they were "in the fullest sense 'at risk,'" but they were equally at risk in anyone's hand. Obviously, this is not the source of the transforming power.

Were the notes equity in petitioners' hands because Birmingham Steel needed additional capital? Of course, the corporation's capital needs did not change as the notes traveled from hand to hand. And, there is no evidence the corporation needed additional capital.

This was not a new corporation. It was organized on April 28, 1949. The early years of its financial history are not shown, but it had net income of $22,111.20 in 1956 and $47,339.19 in 1957. From 1959 through 1962 it engaged in a steel supply business in addition to doing steel fabricating, and it incurred losses for each of those years as described in the findings. These losses were incurred mainly in the steel supply portion of the business which the corporation was phasing out in 1962. The losses had necessitated additional funds for operating expense which Ovid Birmingham supplied through the loans here in dispute.

The majority emphasizes that Birmingham Steel's books showed a substantial deficit on June 15, 1962, and apparently from this fact

infers the notes became equity—the so-called thin-capitalization theory. But "real values rather than artificial and book values should be applied" in the determination of debt-equity ratios. *Kraft Foods Co.* v. *Commissioner*, 232 F.2d 118, 127 (C.A. 2, 1956). On June 15, 1962, Birmingham Steel had a going steel fabrication business with strong earning potential, demonstrated by its net income of $47,339.19 in 1957; its overall net sales were $688,035.11 in 1960 and $1,039,471.90 in 1961; it had a well-equipped, assembled plant already in production; it had a lease on strategically located property renewable for 25 years. These assets which existed *as of the time of acquisition* were not shown on corporate financial statements. I am convinced that the going-concern value of the steel-fabricating portion of the business was substantial. See *Ainslee Perrault*, 25 T.C. 439, 450–451 (1955), affirmed per curiam 244 F. 2d 408 (C.A. 10, 1957).

All the corporation needed to regain its former profit-making status was the cessation of the steel supply business and the infusion of new management. It is apparent from his attitude shown as a witness as well as the record as a whole that Ovid Birmingham, heir of the late, wealthy, Thomas Frank Birmingham, lacked the interest, desire, or ability to make the business really succeed. Petitioners, on the other hand, had started a similar business in 1958 which grew from gross sales of $72,000 in that year to $1,266,212.85 in 1962.

Under petitioners' aggressive management Birmingham Steel quickly recouped its losses without the infusion of *any* new capital. It liquidated the inventory of the steel supply portion of the business, thus acquiring cash needed for the operation of its steel-fabricating business and for debt payment. As of December 31, 1962, its balance sheet shows no indebtedness except accounts payable of $11,911.13, a small amount of accrued taxes, and the balance of $220,000 due on the notes here in dispute. Its net income was $14,490.08 in 1962, $82,486.74 in 1963, and $191,109.63 in 1964. Disler Engineering's income, as disclosed by the findings, also increased during this period; therefore, there is no basis for an inference that Disler Engineering's income was channeled to Birmingham Steel.

It is well established that every debt-equity case turns on its own facts, *John Kelly Co.* v. *Commissioner*, 326 U.S. 521 (1946), and the facts in *Jewell Ridge Coal Corporation* v. *Commissioner*, 318 F. 2d 695 (C.A. 4, 1963), on which the majority opinion relies, are wholly distinguishable from those in the instant case. *Jewell Ridge* did not involve section 1232(a)(1) at all; it involved an attempted charge-off in 1953 of an allegedly worthless bad debt which the court found was not a debt but was equity. In 1942, three individuals had acquired the stock of a struggling railroad with a long history of deficits which

continued through 1946 when—having been kept alive by the stock-holders' loans—the railroad's indebtedness stood at $127,322.10. They had applied to Interstate Commerce Commission for permission to liquidate the assets of the railroad and permission had been granted. At this point Jewell Ridge paid $150,000 for (a) 6,000 acres of coal land, (b) the railroad's notes to the creditor-stockholders, and (c) the stock of the railroad. Jewell Ridge set about trying to revive the railroad, advancing over $250,000 in cash from 1946 to 1953, bringing the total "debt" to over $384,000 when application was again made to the Interstate Commerce Commission to scrap the railroad because it could not support itself. In 1953, Jewell Ridge sought to charge off $231,666.60 as worthless bad debts.

Pointing to the fact that historically the railroad was a losing proposition; to Jewell Ridge's efforts to restore a failing enterprise; to the failure by Jewell Ridge to accrue interest on the purported indebtedness on its books or the railroad's books (and this with Interstate Commerce Commission approval) ; to the fact that the advances were made even though the railroad had no immediate ability to repay; and to other factors, the court concluded that, even if the $127,322.10 represented loans when made by the prior individual owners, such indebtedness was contributed to the railroad's capital by Jewell Ridge. The facts presented a typical debt-equity, thin-capitalization problem, decided on its own facts. The opinion has repeatedly been cited in similar debt-equity cases, primarily for the proposition that the issue in such cases is a factual one. See *Universal Tractor Equipment Corp.* v. *United States*, 269 F. Supp. 801 (E.D. Va. 1967) ; *Wood Preserving Corp.* v. *United States*, 347 F. 2d 117 (C.A. 4, 1965).

The facts in the instant case are vastly different. Here, Birmingham Steel had a history of successful operation of a potentially highly profitable business which, as late as 1957, had produced over $47,000 in net income, more than one-fifth of the total debt in question; in the preceding year it had sales in excess of $1 million; its losses in the years 1958 to 1961 were attributable to the steel supply business which was being phased out in 1962; it had no need for further capital; and, under new aggressive management with the steel supply venture liquidated, it had sufficient potential earning and debt-paying capacity to discharge the debts in dispute.

Were the notes equity in petitioners' hands because they intended to make a capital contribution? There is no direct evidence to show an intent to contribute the notes to capital, and the testimony and documentary evidence are to the contrary. All parties to the transaction treated the notes as debt instruments, and, of course, they were handled in this manner on their tax returns. There is no basis for a

contrary inference. Indeed, there is the express finding that "Petitioners understood that they were purchasing the stock for $5,000 and the notes for $70,000 and that the notes remained outstanding obligations of Birmingham Steel."

Were the notes equity because they were simply a means, without "independent significance," of purchasing the assets of Birmingham Steel? Once again the evidence does not support this conclusion. Petitioners first learned of Ovid's interest in selling his business on June 12, 1962, and on that day inspected the plant. At the close of the inspection Edwards suggested that the plant and equipment were worth about $75,000. He could not have attached "independent significance" to the notes on that visit for two reasons: First, the finding is that, "at that time, Edwards knew nothing about the financial condition of Birmingham Steel." Second, Edwards testified that on this visit he looked only at the machinery (not the books) because "this was what I thought was for sale."

Two days later, on June 14, 1962, the date "letters of intent" were signed, another meeting was held. At this meeting negotiations shifted to a purchase and sale of the stock. Petitioners for the first time saw an abbreviated financial statement which did not mention the Ovid Birmingham notes and a Dun & Bradstreet report which did mention them. Robert Bridges, petitioners' accountant, found that the books reflected the notes. Before petitioners would sign the letters of intent previously prepared by Kenneth Stainer, Ovid Birmingham's lawyer, they insisted on amending the letters to call for a transfer of the notes as well as the stock. The contract of sale later prepared by Stainer and signed by the parties expressly transferred the notes to petitioners at a stated consideration of $70,000. The corporation owed Tulsa Bank a $90,000 note guaranteed by Ovid Birmingham. Ovid paid this note and a corporate note payable to him was substituted and assigned to petitioners. The notes were subsequently shown as debts of the corporation on its financial statements and, finally, were paid in full. What else could petitioners have done to give the notes "independent significance"?

Were the notes equity because petitioners intended to purchase only the assets of Birmingham Steel? Citing *Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affirmed per curian 187 F. 2d 718 (C.A. 5, 1951), the majority opinion concludes that the assignment of the notes in no way altered petitioners' "constant and single minded objective—i.e., to acquire the physical assets of Birmingham Steel through purchase of the outstanding equity interest. To hold otherwise would be to exalt form over substance." The facts simply do not bear out this conclusion.

True, at the June 12 meeting, petitioners thought only the machinery was for sale and expressed an opinion that it was worth $75,000. If a sale on that basis had been made, Ovid Birmingham would have had the task of disbanding the going business, liquidating the steel supply inventory, applying the proceeds to the payment of debts including some $95,899.18 owed to third parties as well as the note of $241,000 owed to himself, and collecting some $37,727.75 in accounts receivable. But between the June 12 meeting and the June 14 signing of the letters of intent, the negotiations shifted to a sale of stock—a proposal with vastly different implications. Not only did it saddle petitioners, through the corporation, with the responsibility of paying the debts of $95,000 to third parties, and liquidating the steel supply inventory, but also it gave them the notes of $241,000 and the stock of a corporation which owned a going business having sales in excess of $1 million in the prior year, with a well-equipped, assembled plant, and with a lease renewable for 25 years covering strategically located property. There is not a shred of evidence to support a conclusion that, once the negotiations shifted to a stock sale, petitioners had any desire, plan, or objective to acquire the physical assets of Birmingham Steel and the majority opinion points to none. And the fact is that the corporation was not liquidated but continued to exist and became a viable, prosperous enterprise. The mere happenstance that the opinion expressed by petitioners as to the value of the machinery turned out to be the same as the purchase price for the stock and notes should not affect the character of the transaction.

By "canceling" the Ovid Birmingham notes the majority opinion here decrees that Birmingham Steel, despite its proven income-producing and debt-paying capacity, shall assume, beginning at the end of 1962, the role of a corporation virtually without debt. The majority here decrees that petitioners, despite their intention and understanding to the contrary, shall be denied the right to occupy the dual relationship of stockholders and creditors. See *Farley Realty Corp.* v. *Commissioner*, 279 F. 2d 701 (C.A. 2, 1960). In my view, the majority opinion fails to heed the teaching of a host of decisions holding that stockholders of corporations have discretion in deciding how much of their investment they care to risk in the form of capital and how much they wish to risk in the form of debts. See, e.g., *J. S. Biritz Construction Co.* v. *Commissioner*, 387 F. 2d 451 (C.A. 8, 1967); *Murphy Logging Co.* v. *United States*, 378 F. 2d 222 (C.A. 9, 1967); *Nassau Lens Co.* v. *Commissioner*, 308 F. 2d 39 (C.A. 2, 1962); *Byerlite Corp.* v. *Williams*, 286 F. 2d 285 (C.A. 6, 1960); *Miller's Estate* v. *Commissioner*, 239 F. 2d 729 (C.A. 9, 1956); *Kraft Foods Co.* v. *Commissioner, supra; Rowan* v. *United States*, 219 F. 2d 51 (C.A. 5, 1955); *Wilshire & Western Sandwiches, Inc.* v. *Commissioner*, 175

F. 2d 718 (C.A. 9, 1949). Indeed, this case is stronger than the cited cases, as petitioners here, in an admittedly bona fide transaction, merely took the corporate financial structure as they found it.

I understand the majority's reluctance to apply section 1232(a)(1) in a situation where a corporate note has been acquired at a large discount by a shareholder of the corporation, whether in the same transaction as the stock was acquired or in a subsequent one. It gives the appearance of siphoning dividend income from the corporation as capital gain. Congress has imposed limitations in the section as to original issue discount, section 1232(a)(2), but has not seen fit to deny the benefits of the section to persons who occupy the dual role of stockholder and creditor.

Perhaps Congress has taken into account the fact that in a case like this one no new tax benefit is created by applying section 1232(a)(1). Ovid could have collected the principal of the notes without tax consequences. Under the June 15, 1962, transaction he sustained a capital loss measured by his basis of $241,000 minus the $70,000 which he received. This capital loss would correspond with petitioners' capital gain under section 1232(a)(1). But the majority opinion upsets this symmetry by treating all of petitioners' collections on the notes as dividends. I do not think this Court should undertake to make exceptions to section 1232(a)(1) without statutory direction.

FORRESTER, FAY, DAWSON, and IRWIN, *JJ.*, agree with this dissenting opinion.